RESCUE ARMY ET AL. *v.* MUNICIPAL COURT OF
LOS ANGELES.

No. 574.    Argued February 6, 7, 1947.—Decided June 9, 1947.

*Robert H. Wallis* argued the cause and filed a brief for appellants.

*John L. Bland* argued the cause for appellee. With him on the brief was *Ray L. Chesebro*.

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

On the merits this appeal presents substantial questions concerning the constitutional validity of ordinances of the City of Los Angeles governing the solicitation of contributions for charity. First and Fourteenth Amendment grounds are urged as nullifying them chiefly in the view that they impose prior restraints upon and unduly abridge appellants' rights in the free exercise of their religion. Those rights, as claimed, are to engage in soliciting donations for charity as a part of their religion free from the ordinances' restrictions.

Similar, but also distinct, questions were involved in *Gospel Army* v. *Los Angeles,* dismissed today for jurisdictional reasons. 331 U. S. 543. This case, however, arose procedurally in a different fashion, so that it is not subject to the same jurisdictional defect. And the procedural difference is important, not merely for our jurisdiction but also for determining the propriety of exercising it in the special circumstances presented by this appeal.

The California Supreme Court heard and determined the *Gospel Army* case several months in advance of this one. It sustained the regulations in both instances, filing separate opinions in each case. 27 Cal. 2d 232; 28 Cal. 2d 460. But the attack upon the city ordinances in the *Gospel Army* case covered a much wider range than here, and the court's principal opinion was rendered in that cause. Hence in this case it disposed of overlapping issues merely by reference *a fortiori* to its "approval" of the challenged provisions in the *Gospel Army* opinion.

As will more fully appear, this mode of treatment, together with interlacing relationships between provisions involved here and others in the *Gospel Army* case, has combined with the necessitated dismissal of that appeal to create for us difficult problems in determining exactly how much of the regulatory scheme approved in the *Gospel Army* opinion, and hence also how much of that decision, must be taken as having been incorporated in the disposition of this cause. By virtue of the California court's method of decision, we are largely without benefit of its judgment upon these matters, including possible questions of severability. Consequently, this fact, together with the different jurisdictional postures in which the cases reach this Court, would force us to determine those questions independently before undertaking any decision on the merits.

That necessity and the difficulties tendered by the extricating problem raise substantial questions concern-

ing the disposition appropriate, in the unusual situation, to be made of this appeal. In order to present the problem with a fair degree of precision, it is necessary to state in some detail the nature of the two proceedings, their relationships to each other, and their procedural as well as jurisdictional differences.

## I.

This suit is one for a writ of prohibition. The appeal is from the California Supreme Court's judgment denying appellants' application for such a writ. 28 Cal. 2d 460. They instituted the suit in the District Court of Appeal, Second Appellate District, Division Three, of California. Its object was to test the jurisdiction of the respondent Municipal Court of Los Angeles to proceed with a pending criminal prosecution against Murdock, who is an officer of the Rescue Army. In that court he had been charged with violating three provisions of the city ordinances, had been twice convicted, and twice the convictions had been reversed by the Superior Court of Los Angeles County.[1]

While the case was pending in the Municipal Court after the second reversal, appellants filed their petition in this cause in the District Court of Appeal. Alleging that the Municipal Court was threatening to proceed with a third trial on the same charges, they set forth grounds held sufficient under the state procedure to present for adjudication the question of the Municipal Court's jurisdiction. 28 Cal. 2d at 462–467.

The District Court of Appeal denied the writ. Thereupon the state Supreme Court transferred the cause to its own docket and issued an alternative writ of prohibi-

---

[1] The grounds for reversal in each instance were such as did not determine the cause finally, but resulted in remanding it for further trial. The first reversal was for reception of incompetent evidence; the second, for insufficiency of the evidence to prove violations of the ordinances in question.

tion pending determination there. As in the *Gospel Army* case, the Supreme Court, with three of the seven justices dissenting, decided the issues on the merits against the appellants. It therefore denied the writ, at the same time discharging the alternative writ. In short effect the ordinances, insofar as they were involved, were sustained as against the constitutional and other objections raised concerning them. Probable jurisdiction was duly noted here, and the cause was assigned for argument immediately following the *Gospel Army* case.

Apparently Murdock was charged in the Municipal Court with violating three sections of the Municipal Code. These were §§ 44.09 (a), 44.09 (b), and 44.12 of Article 4, Chapter IV.[2] Sections 44.09 (a) and (b) formed the basis for the first count against Murdock.[3] Colloquially speaking, § 44.09 is a "tin-cup" ordinance. In summary, its two subdivisions, (a) and (b), prohibit solicitations in the specified public places or adjacent areas "by means of any box or receptacle" except, under (a), "by the express

---

[2] Appellants refer to the code as Ordinance No. 77,000. According to appellee's brief, Ordinance No. 77,000 consists of a "revision and codification of the regulatory and penal ordinances of the City of Los Angeles, to be known as the Los Angeles Municipal Code," and contains nine chapters, I–IX, subdivided into articles, divisions and sections, the latter numbering in excess of 2000.

The brief further states: "The portion of the Los Angeles Municipal Code involved in this proceeding is Article 4 (Charities and Relief) in Chapter IV (Public Welfare) and consists of nineteen sections numbered 44.01 to 44.19, inclusive. However, not all or any considerable number of such sections are actually involved herein, although a complete treatment of the sections primarily involved may require some mention . . . of most if not all of the other sections." Appellants' view, however, is that substantially all of the provisions of §§ 44.01 to 44.19 are incorporated by reference into §§ 44.09 and 44.12 for purposes of determining their constitutional validity.

[3] It is not clear whether the charges under §§ 44.09 (a) and (b) were made in the alternative or conjunctively. See text *infra,* Part IV, following note 43; see also note 42.

written permission of the Board [of Social Service Commissioners]"; under (b), "without first filing with the Department [of Social Service] a 'notice of intention' as required by Sec. 44.05" and, literally, obeying the further command that "every person so soliciting must in all other respects comply with the provisions of this Article." [4] The full text of the section is set forth in the margin.[5]

The second count charged violation of § 44.12 by soliciting without exhibiting or reading to the persons solicited an information card issued by the Los Angeles Board of Social Service Commissioners. Section 44.12 is more general than § 44.09 as to place and manner of solicitation. It is in the following words:

"No person shall solicit any contributions unless he exhibits an Information Card provided for in Sec. 44.03 of this Article and reads it to the person solicited or presents it to said person for his perusal, allowing him sufficient opportunity to read same, before accepting any contribution so solicited."

Obviously neither § 44.09 (b) nor § 44.12 is self-contained. Each incorporates by reference other sections of the code. Thus, it is necessary to take into account,

---

[4] The article is Article 4 of Chapter IV. See note 2.

[5] Section 44.09. "(a) No person shall solicit any contribution for any purpose by means of any box or receptacle, upon any public street, sidewalk or way, or in any public park or in any publicly owned or controlled place, except by the express written permission of the Board.

"(b) No person shall solicit any charitable contribution, or any contribution for any real or purported charitable purpose, by means of any box or receptacle in any place immediately abutting upon any public sidewalk or way, or in any place of business open to the public, or in any room, hallway, corridor, lobby or entranceway, or other place open to or accessible to the public, or in any place of public resort, without first filing with the Department a 'notice of intention' as required by Sec. 44.05, and every person so soliciting must in all other respects comply with the provisions of this Article."

under § 44.09 (b), the provisions of § 44.05 requiring the filing of the "notice of intention" as well as the omnibus requirement of compliance "in all other respects . . . with the provisions of this Article"; under § 44.12, the requirements of § 44.03 concerning issuance of the information card. Enforcement of § 44.09 (a), which does not refer specifically to other sections, necessarily involves consideration of whatever requirements may relate to securing the board's written permission.

The issue of the Municipal Court's jurisdiction therefore, insofar as it concerns us, turns upon the validity of §§ 44.09 (a), 44.09 (b) and 44.12, together with the other provisions necessarily incorporated in them by reference; and, upon this appeal, their validity not only is relative solely to the effect of the federal constitutional prohibitions, but must be determined in light of the California Supreme Court's interpretation, including the extent to which other provisions have been incorporated. Moreover the jurisdictional question arises substantially as upon demurrer to the charges, since trial has not been had and the issue concerns only the Municipal Court's power to proceed with the criminal cause. Hence only the validity of the provisions on their face, not as applied to proven circumstances, is called in question.[6]

The *Gospel Army* case, on the other hand, was an injunction suit, in which attack was projected on a broad front against the ordinances and the scheme of regulation they embody as a whole. For some reason § 44.09 (a) was not attacked in that suit. But § 44.09 (b) was involved

---

[6] The California Supreme Court said at the end of its opinion, in relation to appellants' contention that the ordinances are being unconstitutionally applied to them: "The allegations relied upon in support of this contention, however, are denied by the answer and the issues of fact thus presented will not be determined by us in this proceeding." 28 Cal. 2d 460, 473. See *Bandini Co.* v. *Superior Court*, 284 U. S. 8, 14; cf. note 26 *infra*.

indirectly through its relation to § 44.05 and § 44.12 directly, as well as numerous other provisions both of Article 4, Chapter IV, and outside it. That article, as we have noted above, consists of Code §§ 44.01–44.19, entitled "Charities and Relief," and thus includes all of the sections involved here as well as many others which were in issue in the *Gospel Army* case.

It is this setting of dovetailed legislative enactments and judicial decisions which creates the primary problem for our disposition. Those interrelations, of the cases and of the ordinances they involve, will be better understood in the setting of a summary of the general scheme.

## II.

The Municipal Code regulates both charitable and other solicitations, as well as pawnbrokers, secondhand dealers, junk dealers, etc. The regulations affecting those dealers lie outside Article 4 and became pertinent in the *Gospel Army* case because of that organization's activities in collecting, repairing, selling and giving away used articles.[7] None of those regulations, however, appears to be involved here.[8] The Municipal Court charges, so far as we can now ascertain, relate exclusively to charitable solicitations and consequently are comprehended within Article 4.[9] We therefore are relieved of the necessity for

---

[7] These operations were performed through the Gospel Army's so-called industrial department. For details see the California Supreme Court's opinion, 27 Cal. 2d 232.

[8] No charges in the Municipal Court purported expressly to be grounded upon the provisions of the ordinance dealing with pawnbrokers, secondhand dealers and junk dealers; and §§ 44.09 (a), (b) and 44.12 do not relate explicitly or, it would seem, by necessary implication, upon their face, to such activities.

[9] Not only are §§ 44.09 (a), (b) and 44.12 located within that article but other provisions of the ordinance which they expressly purport to incorporate are so placed.

taking account of any of the code provisions outside that article.

Article 4, however, comprehends numerous interrelated sections and subdivisions. They provide a broad and general, though also highly detailed and integrated, plan for regulating solicitations in Los Angeles. The sections here in question are integral parts of that plan.

It is designed primarily, though not exclusively, to secure a maximum of information and publicity for the public. It seeks to make available to all persons solicited detailed information concerning the persons soliciting, the causes or organizations on behalf of which they act, and the uses to which the donations will be put. The plan also undertakes, in other ways, to assure responsibility, both moral and financial, on the part of soliciting individuals and agencies; and to see to it that the funds collected are applied to their appropriate purposes.

Machinery for executing the scheme is created through the establishment of a Department of Social Service and a Board of Social Service Commissioners, each with specified administrative powers.[10] Comprehensive and detailed definitions of activities affected and correlative prohibitions are prescribed, together with various provisions for exemption. Violation of the prohibitions, which generally require compliance with one or more other regulations, is made punishable by criminal sanctions.

More narrowly, insofar as the plan is relevant here, any person or association desiring to solicit contributions for a charitable purpose[11] must file with the department, at

---

[10] See notes 13, 16, and text *infra*.

[11] Section 44.01 defines "charitable" to "include the words philanthropic, social service, benevolent, patriotic, either actual or purported." "Contribution" is defined to "include the words alms, food, clothing, money, property or donations under the guise of a loan of money or property." "Solicitation" is broadly defined to include oral or written requests, and requests made by distributing, mailing or pub-

least ten days before beginning to solicit, a written "Notice of Intention." § 44.05. This is, in substance, an application for the "Information Card" provided for in § 44.03 (d). It will be recalled that § 44.09·(b), in issue here, expressly requires the filing of this notice. And § 44.12, also directly in issue, requires exhibition of the card before solicitation may lawfully take place.

The notice must be filed on a form furnished by the department and must contain the "complete information" specified in the margin.[12] § 44.05. The department is

lishing "any handbill," by press announcement, radio, telephone concerning specified types of events, the offering to sell or selling any advertising, book, card, chance, etc., in connection with charitable appeals.

[12] "(a) The purpose of the solicitation and use of the contribution to be solicited;

"(b) A specific statement, supported by reasons and, if available, figures, showing the need for the contribution proposed to be solicited;

"(c) The character of such solicitation and how it will be made or conducted;

"(d) The expenses of the solicitation, including salaries and other items, if any, regardless of from what funds such expenses are payable;·

"(e) What portion of the contributions collected as a result of the solicitation will remain available for application to the specific purposes declared in the Notice of Intention as the object of the solicitation;

"(f) A specific statement of all contributions collected or received by such person or association within the calendar year immediately preceding the filing of such Notice of Intention. The expenditures or use made of such contributions, together with the names and addresses of all persons or associations receiving salaries, wages, compensation, commissions or emoluments from such contributions, and the respective amounts thereof;

"(g) The names and addresses of the officers and directors of any such association for which the solicitation is proposed to be made;

"(h) A copy of the resolution, if any, of any such association authorizing such solicitation, certified to as a true and correct copy of

authorized, among other things, to investigate the statements contained in the notice and to issue information cards "to all solicitors." [13] § 44.03. Those cards must show the detailed matters specified below.[14] *Ibid.* The board is empowered to publish the results of the investigations provided for in § 44.03 [15] and to exercise other powers, such as endorsing a soliciting association, waiving specified requirements, and recalling the information cards for correction.[16] §§ 44.02, 44.03. A fee of four cents per

the original of such resolution by the officer of such association having charge of the records thereof;

"(i) A statement that the signers of such Notice have read and are familiar with the provisions of this Article and will require all solicitors engaged in such solicitation to read and be familiar with all sections of this Article prior to making any such solicitation." § 44.05.

[13] The department's powers are specified in § 44.03 as follows:

"(a) To investigate the allegations of Notice of Intention, or any statement or reports;

"(b) To have access to and inspect and make copies of all books, records and papers of such person, by or on whose behalf any solicitation is made;

"(c) To investigate at any time the methods of making or conducting any such solicitation;

"(d) To issue to all solicitors Information Cards which cards shall show" the matters set forth below in note 14.

[14] "(1) That same is issued as information for the public and is not an endorsement;

"(2) The Board may, pursuant to Ordinance No. 34982, omit above provision and state that they endorse such charitable association;

"(3) The pertinent facts set forth in Notice of Intention required under Section 44.05 of this Article; [See note 12 *supra.*]

"(4) Any additional information obtained as shall in the opinion of the Board be of assistance to the public to determine the nature and worthiness of the purpose for which the solicitation is made."

[15] See note 13.

[16] The board's power to endorse charitable associations is conferred by § 44.02. The powers given by § 44.02 are as follows, except for subsection (e) which for brevity is summarized:

"(a) To publish results of any investigation provided for or au-

560

card is charged, when issued, unless more than twenty-five are issued at one time for the same solicitation. In that event the fee becomes one cent per card.

The foregoing regulations apply, on the face of the ordinance, to charitable solicitations as requirements in the nature of conditions precedent, compliance with which is necessary before solicitation may be lawfully made. There are also other requirements which become applicable during and after the act of solicitation. One is that of § 44.15, which commands persons soliciting for charity to tender to each contributor a written receipt containing specified detailed information.[17] And by

thorized in Section 44.03 subdivisions (a), (b) and (c) of this Article;

"(b) To give such publicity to any such results by such means as may be deemed best to reach the general public and persons interested;

"(c) To waive the whole or part of any provisions of Sections 44.03, 44.05, 44.06, 44.10, 44.11, 44.12, 44.13, 44.15, and 44.02 excepting this subsection, of this Article for the purpose of meeting any extraordinary emergency or calamity;

"(d) To request return of Information Cards to the Department upon completion of solicitation for which they are issued or at the expiration of the period for which they are valid;"

[Subsection (e) authorizes the board to recall and amend or correct the information cards on receiving additional information which, in its opinion, renders inaccurate any statement contained in it.]

"(f) To waive all conditions of this Article upon application of person filing Notice of Intention, in respect to Information Cards and filing copies of written authorization when a campaign or drive for raising funds for any charitable purpose is given general publicity through the press or otherwise, and when more than twenty-five (25) persons serve as solicitors without compensation, if it shall be proved to the satisfaction of the Board that the publicity concerning the solicitation fully informs the general public and the persons to be solicited as to the facts required to be set forth on the Information Card."

[17] In addition to "the amount and kind of the contribution," the receipt must show "substantially" the name of the association aided;

§ 44.14 every such solicitor must file with the department, within thirty days after "the close of any such solicitation" or demand, a report showing the contributions secured and "exactly for what uses and in what manner" they "were or are to be disbursed."

Article 4, moreover, classifies persons soliciting into three groups, two of which are primary, namely, "promoters" and "solicitors." "Solicitors," as will appear, are subdivided into two classes. The regulations bearing upon promoters are more onerous than those touching solicitors and are contained in § 44.19, which itself includes numerous subdivisions.[18]

The exact definitive distinction between solicitors and promoters, who may be either institutions or individuals, is not clear from the definitions given in the ordinance,[19] or indeed from the opinions filed in the state

a statement whether the contribution is to be applied to its "general purposes" or to special ones and, if the latter, "the nature thereof . . . clearly stated"; that the information card was presented for perusal prior to the making of the contribution. But tender of the receipt is not required if the donation is made, in money, by placing it in a locked receptacle previously approved by the board.

[18] The regulations governing promoters require a license from the Board distinct from or additional to the information card which solicitors must secure, § 44.19 (1); the payment of a $25.00 license fee, § 44.19 (4); the filing of a bond in the sum of $2000 conditioned as specified in § 44.19 (3); and proof to satisfy the board that the applicant is "of good character and reputation" and has "sufficient financial responsibility to carry out the obligations incident to any solicitation such applicant may make." § 44.19 (5). The ordinary solicitor, on the other hand, must secure only the information card, which is in effect a permit; pay the cost of the card; and generally, it would seem, comply with the other requirements heretofore outlined for securing the card.

[19] Section 44.01 defines "promoter" to mean "any person who for pecuniary compensation or consideration received or to be received, *solicits* or is engaged in the business of or holds himself out to the public as engaged in the business of soliciting contributions for or on behalf of any other person or any charitable association, corpora-

court.[20]   But, so far as we can gather, the promoter differs from the solicitor, generally at any rate, as being one who engages in solicitation as a business or by exercising a managerial or supervisory capacity over other persons acting as paid solicitors under his direction or pursuant to a program in his charge.[21]

Section 44.19 also regulates the relations between promoters and paid solicitors associated with them.   A pro-

---

tion or institution, or conducts, manages or carries on or agrees to conduct, manage or carry on or is engaged in the business of or holds himself out as engaged in the business of conducting, managing or carrying on any drive or campaign for any such purpose . . . ." (Emphasis added.)

Section 44.01, entitled "Definitions," contains no definition of "solicitor," but defines "solicitation" broadly, as we have indicated in note 11 *supra*.   The meaning of "solicitor" apparently is left therefore to be gathered definitively from the definition of "solicitation" and the use of "solicit" or "solicitor" in the special context of other sections as they become pertinent.

It should be noted that the definition of "promoter" in § 44.01, by including the word "solicits," italicized above, would seem literally broad enough to include any paid solicitor of contributions "for or on behalf of any other person" or charitable organization, and thus to include all solicitors except wholly voluntary ones.   This seems to have been Justice Carter's view as expressed in his dissent in the *Gospel Army* case, 27 Cal. 2d 232, 266.   However, other sections indicate that solicitors may be paid as well as voluntary without becoming promoters.   See § 44.19 (9).   And see note 20.   Murdock apparently receives compensation for his services as an officer of the Rescue Army.

[20] In the *Gospel Army* case the record shows that all the solicitors were paid upon a percentage basis.   Nevertheless, the court dealt in its opinion with the provisions governing solicitors as well as promoters, thus indicating apparently that in its view the difference was other than that solicitors are voluntary workers and promoters are paid. The ordinance and the state court's opinions, more especially in the *Gospel Army* case, appear to treat the two groups as distinct and not merely overlapping in relation to persons themselves engaged in direct solicitation.

[21] See notes 19 and 20.

moter is forbidden by § 44.19 (9) (a) to cause or permit any person for compensation "to solicit or receive on his behalf or at his instigation, under his direction or control or in his employment, any contribution unless such person shall be registered as a solicitor by the Board." And the next subsection requires the registered solicitor to prove his good moral character and reputation for honesty, to file a $500 bond, and to pay a $1.00 registration fee. § 44.19 (9) (b), (d).

Section 44.19 thus apparently is effective to create two classes of solicitors, namely, registered and unregistered, as well as the distinction between promoters and solicitors; and establishes special and more burdensome conditions for lawful solicitation by registered solicitors, as well as by promoters, than are created for solicitors not required to be registered.

Finally, without detailed elaboration, numerous regulations in addition to or interwoven with those relating to solicitors of both types and to promoters govern the organizations or charities on whose behalf the solicitations are made.[22]

The foregoing summary is perhaps more than sufficient to show the comprehensive nature of the plan and the intricately interlacing relationships of the numerous provisions of Article 4 making up the general scheme in which §§ 44.09 (a), (b) and 44.12 find their context and setting. Some no doubt could be applied independ-

---

[22] Specific and highly detailed records and reports must be made of contributions received, of expenditures, and of other matters. §§ 44.08, 44.14. Written and corporately authenticated authorizations must be issued. §§ 44.10, 44.11. Indeed compliance with such requirements as those relating to filing the notice of intention under § 44.05 and procuring the information card under § 44.03 for use by persons acting for the charity forces organizational conformity as much as individual. And by departmental regulation, apparently, fifty per cent of all contributions received must be applied to the charitable purpose rather than to expenses of collection or promotion.

ently, perhaps for example § 44.09 (a).[23]   But others are interwoven with one or more distinct provisions to specify essential constituent elements.   And in many instances the provisions so imported require or suggest still further reference to additional ones.   The article is in fact a web of intricately dovetailing references and cross-references.

Thus, with respect to the sections involved here, § 44.12 requires exhibition of the information card provided for in § 44.03.   This in turn forces reference to § 44.05, which specifies the conditions for securing the card.   And fulfillment of those conditions may compel resort to still other provisions.   The same process must be gone through with respect to § 44.09 (b).   For while that section differs verbally from § 44.12 in that it specifically requires only the filing of the notice of intention, not issuance or exhibition of the information card, not only is the procedure for filing the notice highly detailed and largely set forth in other sections.   It is also highly doubtful, in view of the California Supreme Court's decision, whether persons so complying and filing the notice would be authorized by that act alone to proceed with lawful solicitation under

---

[23] The subsection is one of the few not referring to other provisions of the article or the code.   None of them contains any specification of conditions for securing the board's written permission. Cf. note 5.   The California Supreme Court, however, supplied them in the following language: "We conclude, therefore, that if subdivision (a) of section 44.09 is read, as it must be, in light of the purpose and context of the entire ordinance, on the one hand, and the peculiar circumstances attendant upon collections by means of receptacles in public places, on the other hand, that the denial of a permit is warranted only if the information furnished to the board discloses fraud or if the solicitation as planned would interfere with the public convenience and safety."   28 Cal. 2d at 471–472.

It becomes unnecessary, however, to consider the validity of possible independent application of § 44.09 (a), for reasons to be stated.   See text *infra* Part IV, following note 43.

§ 44.09 (b), without waiting the specified ten-day period (§ 44.05) and undergoing the investigations prescribed by § 44.03 or perhaps actually procuring the card.[24]

It is necessary, in order to complete the environment of the problem presented by the appeal, to set forth somewhat more fully the manner in which the California Supreme Court dealt with §§ 44.09 (a), 44.09 (b) and 44.12, and related provisions. This, however, may best be deferred at this point, in order to state the legal principles which we think are controlling of our disposition.

## III.

The *Gospel Army* case we have dismissed for the technical, nevertheless important, reason that under California law the state Supreme Court's reversal, without more, contemplates further proceedings in the trial court. Consequently that judgment is not final for the purposes of our jurisdiction on appeal, within the meaning of § 237 (a) of the Judicial Code, 28 U. S. C. § 344 (a). 331 U. S. 543.

On the other hand, this appeal is not subject to that particular infirmity. The effect of the California Supreme Court's judgment, of course, will be to permit further proceedings by the Municipal Court. But under the rule of *Bandini Co.* v. *Superior Court,* 284 U. S. 8, this prohibition proceeding would be an independent suit, in relation to that criminal prosecution, "and the judgment finally disposing of it," as did the state Supreme Court's judgment, "is a final judgment within the meaning of § 237 (a) of the Judicial Code." 284 U. S. at 14.[25]

---

[24] See text *infra* Part IV, *circa* note 50.

[25] The following authorities were cited and relied upon: *Weston* v. *Charleston,* 2 Pet. 449, 464; *Mt. Vernon Cotton Co.* v. *Alabama Power Co.,* 240 U. S. 30, 31; *Missouri ex rel. St. Louis, B. & M. R. Co.* v. *Taylor,* 266 U. S. 200, 206; *Michigan Central R. Co.* v. *Mix,* 278 U. S. 492, 494.

The *Bandini* case, like this one, was a prohibition proceeding brought in a California District Court of Appeal. Its object was to determine the jurisdiction of a state Superior Court in an equity cause. That suit had been brought by the state Director of Natural Resources to enjoin alleged unreasonable waste of natural gas, pursuant to the Oil and Gas Conservation Act of California. A preliminary injunction issued in the Superior Court. Thereupon the writ of prohibition was sought to restrain the enforcement of the order, and of the Act, which was attacked under the Fourteenth Amendment on due process and equal protection grounds. The writ was denied, as was hearing by the California Supreme Court. Upon appeal here this Court sustained its jurisdiction and determined the constitutional issues presented upon the face of the statute,[26] affecting the Superior Court's jurisdiction, adversely to the appellants' contentions.

The *Bandini* ruling is well settled.[27] Apparently, however, it has been applied to a proceeding in prohibition relating to a criminal prosecution in but a single case, *Plessy* v. *Ferguson,* 163 U. S. 537, without discussion. On the other hand, a close, indeed it would seem a complete,

---

[26] Referring to the state court's denial of the writ, the *Bandini* opinion stated: "That judgment, however, merely dealt with the jurisdiction of the Superior Court of the suit for injunction, and the only question before us is whether the District Court of Appeal erred in deciding the federal questions as to the validity of the statute upon which that jurisdiction was based. Moreover, with all questions of fact, or with questions of law which would appropriately be raised upon the facts adduced in the trial of the case in the Superior Court, as a court competent to entertain the suit, we are not concerned on this appeal." 284 U. S. at 14. ". . . the District Court of Appeal must be regarded, as its opinion imports, as having determined merely that the statute was valid upon its face so that the Superior Court had jurisdiction to entertain the injunction suit. It is that determination alone that we can now consider." 284 U. S. at 15–16.

[27] See the authorities cited in notes 25 and 28.

analogy is to be found in *Bryant* v. *Zimmerman,* 278 U. S. 63. In that case Bryant had been charged criminally in the courts of New York with violating that state's so-called anti-secret organization statute, and was held in custody for trial pursuant to that charge. He instituted *habeas corpus* proceedings in the state courts, on the ground that "the warrant under which he was arrested and detained was issued without any jurisdiction, in that the statute which he was charged with violating was unconstitutional." 278 U. S. at 65. Upon appeal from the state court's denial of the writ, this Court with one justice dissenting entertained the appeal and held the statute valid.

Although the jurisdictional inquiry, in the state courts and here, was conducted in the separate proceeding on *habeas corpus,* unlike the *Bandini* case it related to a criminal cause, as does this case. And for the purposes of our jurisdiction under § 237 (a) of the Judicial Code, a distinction would seem to be wholly verbal between such an inquiry and its disposition made under the state procedure of *habeas corpus* and a similar one made in a state proceeding for a writ of prohibition.[28] Those procedures, of course, have their historic differences, both in availability and in specific function, at the common law. But when they are utilized, under state authorization, substantially for the identical purpose of questioning the validity of state statutes under the federal constitution, as determinative of the jurisdiction of state courts to proceed with crim-

[28] In *Holmes* v. *Jennison,* 14 Pet. 540, the Court held that an order of a state court of last resort refusing to discharge a prisoner upon *habeas corpus* was a final judgment subject to review. In reaching that conclusion Taney, C. J., relied upon *Weston* v. *Charleston,* 2 Pet. 449, as "decisive." That decision, rendered by Marshall, C. J., held for the first time that the denial of a writ of prohibition was a final judgment. See also *Largent* v. *Texas,* 318 U. S. 418, where the Court cites both *Bandini Co.* v. *Superior Court,* 284 U. S. 8, and *Bryant* v. *Zimmerman,* 278 U. S. 63.

inal prosecutions based on those acts, it would seem difficult to find any substantial difference between them relative to this Court's jurisdiction to review their determinations. This assumes, of course, that the judgment reviewed under one name or the other would be such as finally disposes of the proceeding.

While therefore we are unable to conclude that there is no jurisdiction in this cause, nevertheless compelling reasons exist for not exercising it.

From *Hayburn's Case,* 2 Dall. 409, to *Alma Motor Co.* v. *Timken-Detroit Axle Co.* and the Hatch Act case decided this term,[29] this Court has followed a policy of strict necessity in disposing of constitutional issues. The earliest exemplifications, too well known for repeating the history here, arose in the Court's refusal to render advisory opinions and in applications of the related jurisdictional policy drawn from the case and controversy limitation. U. S. Const., Art. III. The same policy has been reflected continuously not only in decisions but also in rules of court and in statutes made applicable to jurisdictional matters, including the necessity for reasonable clarity and definiteness, as well as for timeliness, in raising and presenting constitutional questions.[30] Indeed perhaps the most effective implement for making the policy effective has been the certiorari jurisdiction conferred upon this Court by Congress. E. g., Judicial Code, §§ 237, 240.

The policy, however, has not been limited to jurisdictional determinations. For, in addition, "the Court [has] developed, for its own governance in the cases confessedly

[29] *Alma Motor Co.* v. *Timken-Detroit Axle Co.,* 329 U. S. 129; *United Public Workers* v. *Mitchell,* 330 U. S. 75.

[30] See, *e. g.,* as to appeals from state courts, § 237 (a) of the Judicial Code, 28 U. S. C. § 344 (a), Rule 12 (1) of the Revised Rules of the Supreme Court of the United States; *Honeyman* v. *Hanan,* 300 U. S. 14.

within its jurisdiction, a series of rules under which it has avoided passing upon a large part of all the constitutional questions pressed upon it for decision." [31]    Thus, as those rules were listed in support of the statement quoted, constitutional issues affecting legislation will not be determined in friendly, nonadversary proceedings; in advance of the necessity of deciding them; in broader terms than are required by the precise facts to which the ruling is to be applied; if the record presents some other ground upon which the case may be disposed of; at the instance of one who fails to show that he is injured by the statute's operation, or who has availed himself of its benefits; or if a construction of the statute is fairly possible by which the question may be avoided.[32]

Some, if not indeed all, of these rules have found "most varied applications." [33]    And every application has been an instance of reluctance, indeed of refusal, to undertake the most important and the most delicate of the Court's functions, notwithstanding conceded jurisdiction, until necessity compels it in the performance of constitutional duty.

---

[31] Brandeis, J., with whom Stone, Roberts and Cardozo, JJ., concurred, in *Ashwander* v. *Tennessee Valley Authority*, 297 U. S. 288, concurring opinion at 346.

[32] *Id.*, at 346–348, and authorities cited.    See also *Coffman* v. *Breeze Corporations*, 323 U. S. 316, 324–325.

[33] For example, with reference to the rule forbidding decision of properly presented constitutional questions, if the case may be disposed of on another ground: "Thus, if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.    *Siler* v. *Louisville & Nashville R. Co.*, 213 U. S. 175, 191; *Light* v. *United States*, 220 U. S. 523, 538.    Appeals from the highest court of a state challenging its decision of a question under the Federal Constitution are frequently dismissed because the judgment can be sustained on an independent state ground.    *Berea College* v. *Kentucky*, 211 U. S. 45, 53." 297 U. S. at 347.

Moreover the policy is neither merely procedural nor in its essence dependent for applicability upon the diversities of jurisdiction and procedure, whether of the state courts, the inferior federal courts, or this Court. Rather it is one of substance,[34] grounded in considerations which transcend all such particular limitations. Like the case and controversy limitation itself and the policy against entertaining political questions,[35] it is one of the rules basic to the federal system and this Court's appropriate place within that structure.[36]

Indeed in origin and in practical effects, though not in technical function, it is a corollary offshoot of the case and controversy rule. And often the line between apply-

---

[34] "If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Spector Motor Service* v. *McLaughlin*, 323 U. S. 101, 105. It has long been the Court's "considered practice not to decide abstract, hypothetical or contingent questions . . . or to decide any constitutional question in advance of the necessity for its decision . . . or to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied . . . or to decide any constitutional question except with reference to the particular facts to which it is to be applied . . . ." *Alabama State Federation of Labor* v. *McAdory*, 325 U. S. 450, 461. "It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case." *Burton* v. *United States*, 196 U. S. 283, 295.

[35] Which has had application in appeals and on writs of error, as well as in cases arising under the certiorari jurisdiction. See *Luther* v. *Borden*, 7 How. 1; *Pacific States Tel. & Tel. Co.* v. *Oregon*, 223 U. S. 118; *Ohio ex rel. Davis* v. *Hildebrant*, 241 U. S. 565; opinion of FRANKFURTER, J., in *Colegrove* v. *Green*, 328 U. S. 549.

[36] Like the policy about political matters, although not going to jurisdiction as that policy does, it is a rule "which cannot be met by verbal fencing about 'jurisdiction.' It must be resolved by considerations on the basis of which this Court, from time to time, has refused to intervene in controversies." Opinion of FRANKFURTER, J., in *Colegrove* v. *Green*, 328 U. S. 549, 552.

ing the policy or the rule is very thin.[37]   They work, within their respective and technically distinct areas, to achieve the same practical purposes for the process of constitutional adjudication, and upon closely related considerations.

The policy's ultimate foundations, some if not all of which also sustain the jurisdictional limitation, lie in all that goes to make up the unique place and character, in our scheme, of judicial review of governmental action for constitutionality.   They are found in the delicacy of that function, particularly in view of possible consequences for others stemming also from constitutional roots; the comparative finality of those consequences; the consideration due to the judgment of other repositories of constitutional power concerning the scope of their authority; the necessity, if government is to function constitutionally, for each to keep within its power, including the courts; the inherent limitations of the judicial process, arising especially from its largely negative character and limited resources of enforcement; withal in the paramount importance of constitutional adjudication in our system.

All these considerations and perhaps others, transcending specific procedures, have united to form and sustain the policy.   Its execution has involved a continuous choice between the obvious advantages it produces for the functioning of government in all its coordinate parts and the very real disadvantages, for the assurance of rights, which

[37] Indeed more than once the policy has been applied in order to avoid the necessity of deciding the "case or controversy" jurisdictional question, when constitutional issues were at stake on the merits, *e. g.*, recently in declaratory judgment proceedings.   See *American Federation of Labor* v. *Watson*, 327 U. S. 582; *United Public Workers* v. *Mitchell*, 330 U. S. 75.   Compare *Alabama State Federation of Labor* v. *McAdory*, 325 U. S. 450, and *Congress of Industrial Organizations* v. *McAdory*, 325 U. S. 472, which arose under state declaratory judgment acts.

deferring decision very often entails. On the other hand it is not altogether speculative that a contrary policy, of accelerated decision, might do equal or greater harm for the security of private rights, without attaining any of the benefits of tolerance and harmony for the functioning of the various authorities in our scheme. For premature and relatively abstract decision, which such a policy would be most likely to promote, have their part too in rendering rights uncertain and insecure.

As with the case and controversy limitation, however, the choice has been made long since. Time and experience have given it sanction. They also have verified for both that the choice was wisely made. Any other indeed might have put an end to or seriously impaired the distinctively American institution of judicial review.[38] And on the whole, in spite of inevitable exceptions, the policy has worked not only for finding the appropriate place and function of the judicial institution in our governmental system, but also for the preservation of individual rights.

Most recently both phases of its operation have been exemplified in declaratory judgment proceedings.[39] Despite some seemingly widespread misconceptions,[40] the

---

[38] It is not without significance for the policy's validity that the periods when the power has been exercised most readily and broadly have been the ones in which this Court and the institution of judicial review have had their stormiest experiences. See *e. g.*, Brant, Storm Over the Constitution (1936).

[39] See the authorities cited in note 37 *supra*. Cf. *Coffman* v. *Breeze Corporations*, 323 U. S. 316, 324.

[40] As the cases cited in note 37 illustrate, the procedure has been utilized to bring for decision challenges to an entire array of statutory provisions alleged to violate rights secured by an almost equal array of constitutional provisions. The strategic conception seems to have been that the declaratory judgment suit furnishes a ready vehicle for presenting and securing decision of constitutional matters, solely upon the pleadings, in highly abstract or premature, if not hypo-

general introduction of that procedure in both state and federal spheres has not reversed or modified the policy's general direction or effects.[41]

One aspect of the policy's application, it has been noted, has been by virtue of the presence of other grounds for decision. But when such alternatives are absent, as in this case, application must rest upon considerations relative to the manner in which the constitutional issue itself is shaped and presented.

These cannot be reduced to any precise formula or complete catalogue. But in general, as we have said, they are of the same nature as those which make the case and controversy limitation applicable, differing only in degree. To the more usual considerations of timeliness and maturity, of concreteness, definiteness, certainty, and of adversity of interests affected, are to be added in cases coming from state courts involving state legislation those arising

---

thetical states of fact, and *en masse.* Such a notion of course is essentially contradictory of the policy and, if accepted, would go far toward nullifying it.

[41] By dispensing with the necessity of asking for specific relief beyond that afforded by adjudication itself, it is true, the occasions for applying the policy through grounding decision upon failure to satisfy remedial limitations have been avoided. But, as sloughing off those limitations has not, and of course could not, overcome the case and controversy requirement, no more was this intended to discard the corollary policy effective within the limits of conceded jurisdiction.

Indeed the discretionary element characteristic of declaratory jurisdiction, and imported perhaps from equity jurisdiction and practice without the remedial phase, offers a convenient instrument for making the policy effective, quite to the contrary effect of the conception discussed in note 40 above. But that element, for application of the policy, is only one of convenience, not one of necessity. No more is application dependent upon it, essentially, than upon the similar element in other types of suit, as for example in suits for injunctive relief. Cf. *Spector Motor Service* v. *McLaughlin,* 323 U. S. 101.

574

when questions of construction, essentially matters of state law, remain unresolved or highly ambiguous. They include, of course, questions of incorporation by reference and severability, such as this case involves. Necessarily whether decision of the constitutional issue will be made must depend upon the degree to which uncertainty exists in these respects. And this inevitably will vary with particular causes and their varying presentations.

Accordingly the policy's applicability can be determined only by an exercise of judgment relative to the particular presentation, though relative also to the policy generally and to the degree in which the specific factors rendering it applicable are exemplified in the particular case. It is largely a question of enough or not enough, the sort of thing precisionists abhor but constitutional adjudication nevertheless constantly requires. And it is this kind of question that the declaratory judgments procedure has facilitated in presentation, a consequence which dictates the greatest care in seeing that it be not utilized so as to become a means for nullifying the policy.

Much the same thing may be said for the state procedure in prohibition as it has been followed in this case. Indeed, in all but name the two procedures are substantially identical, for the purposes of our jurisdiction and function in review. Here relief is neither sought nor needed beyond adjudication of the jurisdictional issue. The suit seeks only, in substance, a judicial declaration that jurisdiction does not exist in the Municipal Court. But for a variety of reasons the shape in which the underlying constitutional issues have reached this Court presents, we think, insuperable obstacles to any exercise of jurisdiction to determine them.

Those reasons comprise not only obstacles of prematurity and comparative abstractness arising from the nature of the proceeding in prohibition and the manner in which the parties have utilized it for presenting the con-

stitutional questions. They also include related considerations growing out of uncertainties resulting from the volume of legislative provisions possibly involved, their intricate interlacing not only with each other on their face but also in the California Supreme Court's disposition of them, and especially from its treatment of this case by reference in considerable part to the *Gospel Army* case, difficulties all accentuated for us of course by the necessity for dismissal of that cause here. Because the application of the policy must be relative to the factors specifically dictating such action, a statement of our particular reasons follows.

## IV.

In the first place, the constitutional issues come to us in highly abstract form. Although raised technically in the separate proceeding in prohibition, they arise substantially as upon demurrer to the charges against Murdock in the criminal proceeding. The record presents only bare allegations that he was charged criminally with violating §§ 44.09 (a), 44.09 (b) and 44.12, and that those sections are unconstitutional, on various assignments, as applied to his alleged solicitations. We are therefore without benefit of the precision which would be afforded by proof of conduct made upon trial. Moreover, we do not have the benefit on this record of even the literal text of the charges.[42] Indeed, the summarized statement of the pleadings leaves us in doubt whether there were only two or, on the other hand, three distinct offenses charged.[43]

---

[42] It is alleged in the petition for the writ of prohibition that Murdock was charged with having violated §§ 44.09 and 44.12 of the Municipal Code "in that, as it is charged in said complaint, Court [sic] I thereof, said Murdock solicited contributions, and in Court [sic] II thereof, that said Murdock had no permit or Information Card, and failed to show the same to a person solicited by said Murdock. . . ."

[43] See note 3 *supra*.

The pleadings seem to allege that Murdock was charged with violation of three different provisions of Article 4, namely, §§ 44.09 (a), 44.09 (b) and 44.12. Yet they allege equally clearly that there were only two counts. The second rested, as we have said, on § 44.12. But from the state of the pleadings we cannot be sure whether the first was grounded on § 44.09 (a), on § 44.09 (b), or on both and, if the latter, whether conjunctively or alternatively.

The California Supreme Court's decision purported to deal with both. But the opinion did not discuss the anomaly of including two distinct charges in a single count. Nor did it decide whether that count was intended to charge two such offenses independently, one under each subdivision, or only commission of those offenses alternatively, that is, either an offense under § 44.09 (a) or one under § 44.09 (b) in order, possibly, to anticipate contingencies of proof.

We might assume either one construction or the other, of course, and make our disposition accordingly. Perhaps the more tenable assumption would be that Murdock was charged conjunctively under both subdivisions, rather than that he was confronted with an alternative allegation. But the doubt raised concerning this, by conjunction of the charges in a single count, is substantial; the matter is, for present purposes, entirely one of state procedure and state law; and therefore is one for the state court of last resort to resolve. In these circumstances we are unwilling to undertake clarifying the ambiguity. To do so would be directly contrary to the policy of avoiding constitutional decisions until the issues are presented with clarity, precision and certainty.

The two subdivisions, while complementary in regulating solicitation by receptacles, are entirely distinct not only in the places where the regulations apply, but also in the conditions prescribed to be fulfilled before lawful

solicitation may take place. Those differences are substantial, not merely nominal or technical.[44] With the possibility presented by the record that only one or the other provision may be involved in the final disposition of the criminal proceeding, as a matter of pleading and proof and not simply of the jury's action, it is entirely too speculative whether one sort of regulation or the other actually will be utilized to secure Murdock's conviction for us to express opinion at this stage on the constitutionality of either. For the same reason we are unwilling to determine the validity of both, notwithstanding the California court has held each valid. That decision on our part, consistently with the policy, should await the determination which necessarily will be made in the further proceedings in the Municipal Court, whether Murdock has been charged independently or alternatively under the two subsections in the first count.

Other reasons relating particularly to § 44.09 (b) sustain this conclusion. In the first place, the California court's opinions give us no guide concerning the effect of that section's concluding omnibus clause, requiring compliance "in all other respects . . . with the provisions of this Article." Whether or not that court, treating the section independently as we must do,[45] would regard it as effective to incorporate all or only some of the many provisions of Article 4, and in the latter event how many, are matters upon which we are altogether without light. And those questions, being matters of state law, are essentially for the state court's determination, not ours.

[44] See note 5 *supra*.

[45] That is, independently of the entire scheme considered as a valid plan of regulation in all its parts, as the California court substantially considered it in the *Gospel Army* case. Dismissal of that appeal, of course, forbids expression by us of any opinion upon the merits of the issues as involved in that presentation, aside from those necessarily incorporated in the decision of this cause.

Moreover they are substantial. As we have shown, the requirements of Article 4 concerning lawful solicitation are many and varied. Presumably, though by no means certainly, the special ones of § 44.19, relating to promoters and registered solicitors, would not become applicable under a general charge made pursuant to § 44.09 (b). But a literal application of the concluding language of § 44.09 (b) would make them so, upon proof of violation. And, in that event, Murdock conceivably could be convicted upon proof of his failure to pay the substantial license fees, give the bonds, or otherwise comply with the more burdensome provisions of § 44.19, even though he had fulfilled the explicit command of § 44.09 (b) for filing the notice of intention as required by § 44.05 and, indeed, all other requirements of Article 4 outside § 44.19.

Whether the charge under § 44.09 (b) comprehends failure to comply with all of the conditions of Article 4 or only some of them, and if the latter which ones, depends on whether the omnibus clause is to be literally applied, disregarded entirely,[46] or possibly construed in some modified way involving neither of these extremes. This Court certainly has no proper function to undertake such a task of interpretation. Apart from invading the state court's function, the problem of extricating the applicable provisions from such a mass, together with matters of severability likely to arise, would be formidable. And when discharged the result might be merely that we had performed it and determined the constitutional issues so presented, only to find that in the further proceedings to be had in the Municipal Court our interpretation had been put aside in favor of another.

---

[46] Under the familiar but not invariably applied rule of *ejusdem generis*. See, e. g., *Los Angeles* v. *Superior Court*, 2 Cal. 2d 138, 140; *Pasadena University* v. *Los Angeles County*, 190 Cal. 786, 790; *In re Johnson*, 167 Cal. 142, 145.

Moreover that cause hardly can proceed to final decision without clarification of the charge, or making clarification unnecessary. Murdock's rights thus can be assured of protection, even though at the trouble and expense of undergoing another trial. Those inconveniences, concededly substantial, do not outweigh the strong considerations relative to this Court's functions dictating that it should not undertake a task at once so speculative and so foreign to them.

Somewhat less obviously, similar difficulties are presented for dealing with the more specific requirement of § 44.09 (b) for filing the notice of intention and the related one of § 44.12 for procuring and exhibiting the information card.[47] Simply upon the face of the ordinance (Article 4), we would construe these provisions as excluding all reference to the licensing requirements of § 44.19, as well as the regulations relating to dealers in used articles, junk, etc.,[48] as indeed the California Supreme Court's opinion seems to exclude them. In such a view the charges under § 44.09 (b) (without reference to the omnibus concluding clause) and § 44.12 would be restricted to failure to comply with whatever provisions of §§ 44.01–44.18 may be incorporated by reference in those two sections. Presumably also, within that range, would be excluded all requirements applicable only after the act of solicitation, such as those for keeping records and making reports of the receipt and disposition of contributions received, §§ 44.09, 44.14, cf. also § 44.08, and perhaps though not at all certainly (as to the charge under § 44.12)[49] the tendering at the time of solicitation of the receipt required by § 44.15. Possibly therefore a fair construction of the charges under §§ 44.09

---

[47] See note 5 *supra* and § 44.12 as quoted above in the text, Part I.

[48] See text *supra* Part II.

[49] The receipt requirement apparently is not applicable to solicitations by receptacle under §§ 44.09 (a) and (b). See note 17 *supra*.

(b) and 44.12 would be that they are limited, so far as concerns incorporation of other provisions, to including the licensing requirements of §§ 44.05 and 44.03, themselves extensive and highly detailed, which so far as we can gather from the California court's treatment of them, was the effect of its decision.

Apart, however, from the difficulties created by the necessity of adding construction of the California court's opinions to construction of so many possibly applicable provisions of the ordinance, other problems have arisen from its disposition. In particular, its opinions do not enlighten us concerning the character and effects of the licensing requirements specified in §§ 44.05 and 44.03. With reference to them it said in its *Gospel Army* opinion:

> "The information cards, which are in effect permits to solicit, are issued automatically upon the filing of the required information and the payment of the four cents for each card. The department is given no authority to withhold such cards when these requirements are met, and we cannot assume that it will abuse its authority in order to withhold them. . . . 'If this petitioner had applied for a permit under the requirement [of § 44.05], . . . and been either whimsically or arbitrarily refused such permit, he might then . . . have had recourse to the courts for relief from such unjust and arbitrary action.' " 27 Cal. 2d at 238–239.

So construing the licensing provisions and asserting that they are "designed primarily to secure information that will assist the public in judging the nature and worthiness of the cause . . . and to insure the presentation of such information to prospective donors," the California court concluded: "We find nothing unduly burdensome or un-

reasonable in any of these provisions." 27 Cal. 2d at 237.

Nevertheless, the construction given is, to say the least, ambiguous. For, despite the language indicating that the cards are to be issued "automatically upon the filing of the required information and the payment of the four cents for each card," the opinion expressly asserted that the department "may investigate the statements in the notice of intention." 27 Cal. 2d at 239. And at another point it said: "The board may not disallow a proposed solicitation but it may investigate the statements in the notice of intention and the methods of making or conducting the solicitation; it may inspect the records of the person in charge of the solicitation and the association for whom it is made, and it may give such publicity to its findings as it deems best to reach the general public and persons interested." [50] *Ibid.*

These qualifications make it highly questionable that the court, by using "automatically" in the quoted context, meant to rule that on the mere filing of the required information, without more, solicitation would become lawful under § 44.09 (b) or that the information cards would issue so as to make solicitation legal under § 44.12. Rather, the intended holding would seem to have been that, upon full compliance with the numerous conditions specified for issuance of the card, the board would be without authority "either whimsically or arbitrarily" to withhold it from the applicant; but his failure in any substantial respect to meet those conditions, including perhaps waiting for the ten-day period and the out-

---

[50] The last quoted matter was followed by the statement: "The association for whom the solicitation is made must maintain an accounting system recording the entry of all donations and disbursements. (§ 44.08.)" This provision relates apparently to the further requirements for filing post-solicitation reports.

come of the authorized investigations, would be good and sufficient cause for the board to exercise its discretion to refuse the card and for prosecution if he should undertake to solicit without it.

That this probably was the court's intended construction appears not only from its apparent unwillingness to dispense with the necessity for meeting any of the conditions specified in the ordinance, but also from the manner in which it disposed of the provisions relating to promoters and to solicitors required to be registered under § 44.19. In this connection it said, also in the *Gospel Army* opinion:

> "The board has no discretion to withhold a license if the applicant's good character and reputation and his financial responsibility are established and the required bond is filed. The board is not free to deny licenses, but must act reasonably in the light of the evidence presented." 27 Cal. 2d at 249.[51]

There is, of course, a very substantial difference between the two possible views of the court's construction of the ordinances, for constitutional as well as other purposes. For in the one conception the provisions would be more

---

[51] The quoted sentences were preceded by the following: "The requirement that promoters and the solicitors working under them submit proof of their good character and reputation does not discriminate against plaintiff or other religious organizations or censor their religious beliefs, nor does the regulation vest arbitrary power in the administrative board in authorizing it to withhold a license if it is not satisfied that the applicant is of good character and reputation. Such a requirement is common in statutes regulating admission to professions and occupations involving duties of a fiduciary character. . . . The filing of a bond is also a common requirement in the regulation of occupations or activities involving the handling of entrusted funds. . . . The license fee is a reasonable one, covering the expenses of investigations and administration." 27 Cal. 2d 232, 248–249.

nearly akin to a "mere identification" requirement such as the First Amendment has been said not to forbid; in the other, they would comprehend a much broader exercise of administrative discretion than simply receiving and filing identifying information.[52]   Obviously it would be one thing to sustain the licensing provisions if they are to be taken as of the "automatic mere identification" type, and quite another if they involve the very considerable degree of discretion upon the part of administrative officials which the clearly applicable provisions of the ordinance seem to require by their terms and indeed by the state court's ruling.

But we express no opinion concerning their validity in either conception.   For we do not undertake to resolve

---

[52] See *Thomas* v. *Collins,* 323 U. S. 516, 538–539: "How far the State can require previous identification by one who undertakes to exercise the rights secured by the First Amendment has been largely undetermined.   It has arisen here chiefly, though only tangentally, in connection with license requirements involving the solicitation of funds, *Cantwell* v. *Connecticut* [310 U. S. 296] ; cf. *Schneider* v. *State,* 308 U. S. 147; *Largent* v. *Texas,* 318 U. S. 418, and other activities upon the public streets or in public places, cf. *Lovell* v. *Griffin,* 303 U. S. 444; *Hague* v. *C. I. O.,* 307 U. S. 496, or house-to-house canvassing, cf. *Schneider* v. *State, supra.*   In these cases, however, the license requirements were for more than mere identification or previous registration and were held invalid because they vested discretion in the issuing authorities to censor the activity involved.   Nevertheless, it was indicated by dictum in *Cantwell* v. *Connecticut,* 310 U. S. 296, 306, that a statute going no further than merely to require previous identification would be sustained in respect to the activities mentioned."

The dictum referred to is the statement: "Without doubt a State may protect its citizens from fraudulent solicitation by requiring a stranger in the community, before permitting him publicly to solicit funds for any purpose, to establish his identity and his authority to act for the cause which he purports to represent." *Cantwell* v. *Connecticut,* 310 U. S. 296, 306.

the doubt which necessarily exists concerning the court's meaning, whether with reference to § 44.09 (b) or § 44.12. On the contrary that doubt only adds to the reasons we have stated, the sum of which in this case goes to preclude the exercise of jurisdiction. That doubt also should be resolved, with the other uncertainties in this cause, before this Court undertakes to pronounce judgment on the constitutional questions. They may be removed in the Municipal Court proceedings yet to take place.

We are not unmindful that our ruling will subject the petitioner Murdock to the burden of undergoing a third trial or that this burden is substantial.[53] Were the uncertainties confronting us in relation to this Court's historic policy less in number, and resolving them not so far from our appropriate function in cases coming from state courts, the inconvenience of undergoing trial another time might justify exercising jurisdiction in this cause. But, consistently with the policy, jurisdiction here should be exerted only when the jurisdictional question presented by the proceeding in prohibition tenders the underlying constitutional issues in clean-cut and concrete form, unclouded by any serious problem of construction relating either to the terms of the questioned legislation or to its interpretation by the state courts.

Our decision of course should be without prejudice to any rights which may arise upon final determination of the Municipal Court proceeding, relative to review in this Court of that determination. With that reservation we think the only course consistent, upon this record, at once with preservation of appellants' rights and with adherence

---

[53] The Rescue Army, so far as appears, was not a party to the Municipal Court suit. No issue was made here concerning its appearance as a party in the prohibition proceedings in the state courts or on this appeal. Accordingly, we express no opinion in this respect. Cf. *Independent Warehouses* v. *Scheele*, 331 U. S. 70.

to our long-observed policy, is to decline to exercise jurisdiction in this cause.

Accordingly, the appeal is dismissed, without prejudice to the determination in the future of any issues arising under the Federal Constitution from further proceedings in the Municipal Court.

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE MURPHY, with whom MR. JUSTICE DOUGLAS concurs, dissenting.

It is difficult for me to believe that the opinion of the Supreme Court of California is so ambiguous that the precise constitutional issues in this case have become too blurred for our powers of discernment.

The courts below and the parties involved have all acted on the assumption that the appellant Murdock was charged with having violated §§ 44.09 (a) and 44.12 of the Los Angeles Municipal Code. Now it is true that various other parts of the Code are interconnected with those sections and serve to complicate the picture somewhat. But the constitutional issues thereby raised seem clear to me. Simply stated, they are: (1) Does it violate the constitutional guarantee of freedom of religion to prohibit solicitors of religious charities from using boxes or receptacles in public places except by written permission of city officials? (2) Is that guarantee infringed by a requirement that such solictors display an information card issued by city officials?

Those issues were properly raised below and the courts necessarily passed upon them. The time is thus ripe for this Court to supply the definitive judicial answers. Its failure to do so in this case forces me to register this dissent.