SPANISH AMERICAN TOBACCO CO., INC., Plaintiff and Appellee, *v.* RAFAEL SANCHO BONET, TREASURER OF PUERTO RICO, substituted by RAFAEL BUSCAGLIA, Defendant and Appellant.

No. 10129.    Argued June 26, 1950.—Decided December 29, 1950.

*Vicente Géigel Polanco, Attorney General,* and *J. C. Santiago Matos, Assistant Attorney General,* for appellant.    *L. E. Dubón* and *R. García Cintrón* for appellee.

MR. JUSTICE TODD, JR., delivered the opinion of the Court.

It has taken more than ten years for this case to reach this Court after having started in the lower court on April 19, 1939 where, notwithstanding the fact that the complaint was answered on July of the same year, the trial was not held until December 12, 1946 and judgment rendered on June 2, 1949.   We find nothing in the record to justify such an unusual delay in the prosecution of the case.  The facts involved are as follows:

About the months of October, November and December 1938, the Spanish American Tobacco Co., Inc., to whom we shall refer hereinafter as the Corporation, purchased 7692 hundredweights of leaf tobacco, in order to export them to Germany, from the Puerto Rico Tobacco Marketing Association and the Utuado Tobacco Growers, Inc., two domestic cooperative corporations. The Treasurer of Puerto Rico levied the tax authorized by § 1 of Act No. 151 approved May 15, 1937 (Laws of Puerto Rico, 1937, p. 408),[1] to the Corporation on said hundredweights of tobacco and the Corporation in order to prevent the foreclosure of the property which was attached by the Treasurer paid under protest the sum of $1,325.55 which was the amount of the tax plus penalty, fine and interest. The Corporation filed this action to recover said sum alleging that it was not obliged to pay the tax, among other reasons, first, because the latter operates as an export tax and as such is unconstitutional and second, because the cooperative corporations from whom it purchased the tobacco were the first purchasers of the tobacco sold to the Corporation, and hence it was their duty under § 1 of Act No. 151, *supra*, to pay the tax since they are not exempt from said payment.

The Treasurer denied the essential facts of the complaint and after trial was held, the lower court rendered judgment granting the complaint on the sole ground that, according to its findings, the Corporation purchased the tobacco from the cooperatives for the purpose of exporting it to Germany and it was delivered to them at the dock duly packed and ready for export and that said tobacco was actually exported to Germany and consequently, that the tax imposed was void

[1] Said Section provides:

"There shall be levied and collected, once only, on all leaf tobacco harvested in Puerto Rico, at the time it is purchased from the grower, a tax of fifteen (15) cents on each hundred or fraction of a hundred pounds of leaf tobacco harvested in Puerto Rico, which tax shall be paid at the end of each month by the natural or artificial person purchasing said leaf tobacco."

according to § 3 of the Organic Act and Article 1, § 10, Clause 2 of the Federal Constitution which forbid the imposition and collection of any export tax.

The Treasurer appealed and alleges that the lower court erred in deciding that the tax imposed is an export tax and in not deciding that plaintiff was bound to pay the tax because it was the first purchaser.

■ It is a well-settled rule that if a case can be decided on its merits without considering and deciding any constitutional question raised, the courts should do so. In other words, the courts should only consider and determine the constitutionality of an Act when it is necessary for the decision of the action. *Buscaglia, Treas.* v. *Tax Court and Kemper, Int., ante,* p. 278; *Rescue Army* v. *Municipal Court,* 331 U. S. 549, 569, note (33); *Alma Motor Co.* v. *Timken Co.,* 329 U. S. 129.

Applying this rule to the case at bar we consider that the lower court erred in deciding the constitutional question raised by the plaintiff as to whether the tax imposed on the tobacco constituted an export tax since the case could and should have been decided on the other question raised by plaintiff, that is, whether under the terms of the contract of sale of the tobacco between the grower and the cooperatives, the plaintiff corporation could be considered as the first purchaser for the purposes of § 1, Act No. 151, *supra.*

■ As we have seen, § 1 provides that the tax "shall be levied and collected, once only, on all leaf tobacco harvested in Puerto Rico, *at the time it is purchased from the grower,* . . . which tax shall be paid . . . by the natural or artificial person *purchasing* said leaf tobacco." (Italics ours.) Appellant's contention to the effect that the tax is imposed on the grower because the tobacco is harvested by him, since the foregoing Section provides that the tax is imposed "on all leaf tobacco harvested in Puerto Rico," is untenable. We can not fraction said Section by isolating one phrase when the intention of the Legislature is clearly expressed in its

entire context when it provides that the tax shall be imposed "at the time it is purchased from the grower" and shall be paid by "the natural or artificial person purchasing" the tobacco. The taxable event does not arise at the time of growing the tobacco but at the time of purchasing it.

Was the appellee the purchaser of the tobacco from the grower and as such bound to pay the tax? As a matter of fact it was not, for it bought the tobacco from the cooperatives Puerto Rico Tobacco Marketing Association and Utuado Tobacco Growers, Inc., who in turn had purchased it from the growers. Appellant argues, however, that said cooperatives did not acquire the tobacco from the growers by purchase but that it was delivered to them so that, as agents for the growers, they could resell it. This makes us examine the contract executed between the cooperatives and the growers pursuant to § 15 of Act No. 70 on Cooperative Marketing approved August 4, 1925 (Laws of Puerto Rico, 1925, pp. 368, 384)[2] which authorizes the execution of these marketing contracts between the cooperatives and its members.[3] A

---

[2] Section 15 provides as follows:

"*Marketing Contract.*—The association and its members may make and execute marketing contracts, requiring the members to sell, for a period of time not to exceed ten years, all or any specified part of their agricultural products, or certain crops, exclusively to or through the association, or through such agency as the association may create. If they contract a sale to the association, it shall be conclusively held that title to the said products passes absolutely and unreservedly, except for recorded liens, ·to the association upon delivery or at any other specified time, if expressly and definitely agreed upon in the said contract. The contract may provide that the association is authorized to sell or re-sell the products delivered to it by its members, with or without title thereto, and with or without pooling, pay to its members the actual or proportionate re-sale price, after deducting all necessary selling and other costs and overhead expenses, including interest on preferred stock, not exceeding eight (8) per cent per annum and the reserve for retiring the stock, if any; as well as all other proper reserves, plus interest not exceeding eight (8) per cent per annum upon common stock, or after making any other deductions specified in the contract."

[3] The cooperatives in this case were organized according to provisions of Act ,No. 70 of 1925, *supra*. This Act, with some changes is the same as the Standard Marketing Act in force in the United States, and particularly that of Texas.

correct summary of the clauses of said contract is made in the additional brief of the appellee as follows:

"The contract which is designated marketing contract contains 18 clauses in addition to the attendance. In the FIRST clause, the grower—member of the cooperative—is required at all times to fulfill the responsibilities contracted in the deed; by the SECOND the association buys and the grower sells to the association and binds himself to deliver to the latter all the tobacco produced by him or for him or purchased by him or for him as owner of a farm or farms and/or lessee, lessor or sharecropper of a farm or farms; by the THIRD the grower expressly states that at the time of executing the contract he has not entered into any kind of contract of sale or delivery of the tobacco object of the deed with any other person, firm or corporation; but if the obligations contracted by the grower under a previous contract are of the nature of a crop lien or of any other kind, which the grower shall be required to report to the association, the grower authorizes the association to pay to the holder of said lien from the proceeds of the sale of the tobacco object of the contract or from the proceeds of the advance payments or loans on said tobacco, the amount of the lien before making any payment to the grower; by the FOURTH, the grower binds himself to deliver to the association all the tobacco object of this contract at the earliest possible date after the picking and at the place or places which the association designates. *Provided that the parties agree that this contract gives an absolute title to the association over all the tobacco object of this deed as soon as the latter has potencial existence remaining until its delivery under the responsibility and care of the grower;* by the FIFTH any loss which the association may suffer as a consequence of an inferior quality or bad condition of the tobacco at the time of its delivery shall be charged individually to the grower; by the SIXTH the association reserves the right of adopting rules and by-laws for the appointment of inspectors, sorters and classifiers to classify the tobacco and to establish methods of classification, handling, etc.; by the SEVENTH the association has the power to mix the tobacco of the grower with other tobaccos delivered during the same crop by other growers after being classified; by the EIGHT the association agrees on reselling the tobacco delivered by the grower together with the tobacco of other growers sold under contracts similar to this contract at the best marketable prices

and to pay the net amount received from said sale to the grower and to the other growers who have signed contracts similar to this one, according to the amount and classification made by the association of the tobacco delivered by each one, after having deducted the advance payments given to the grower and its interest, the storage expenses, classification, handling, industrialization and sale of said tobacco and the administrative expenses of the association as well as discounts for reserve credits and other commercial purposes and any other obligations which the association may have; by the NINTH the grower expressly agrees and accepts that the association may, within its absolute discretion, handle, sell or strip all or part of the tobacco or use it for industrial purposes but the proceeds of said tobacco in whichever form it be sold will be apportioned by the growers in proportion to the delivery and to the classification made by the association; by the TENTH the association is authorized to sell the tobacco in the local market, in the United States market or in the foreign market, directly to the manufacturers or exporters or through other agencies or persons established for the same purpose at the time and manner and under the conditions which best suit the interests of the growers and of the association; by the ELEVENTH the association is authorized to request and and obtain money loans for any purpose of the association using as security the tobacco delivered to the association and to make, with the money thus obtained, such advance payments to the growers on the tobacco delivered as may be justified, within the discretion of the directors of the association, by the market conditions. By this same clause the association is authorized to sell or mortgage on its own account or as security for its debts all or any portion of its tobacco or its bill of lading, storage receipts, records of sale, or any document in connection with said tobacco; by the TWELFTH it is stipulated that the agreement will bind the grower as long as he produces tobacco, either directly or indirectly, or while he has any legal right over any tobacco or while he has any right as a grower during the enforcement of the contract; by the THIRTEENTH it is provided that if the contract were signed by the members of an agricultural association or commercial entity, all its terms shall apply individually to each member composing the association if said association is dissolved for some reason; by the FOURTEENTH and FIFTEENTH the remedies are established—liquidated damages, injunction, specific per-

formance of contract—which the association may exercise against the grower if the latter fails to comply with the terms of the contract; the SIXTEENTH fixes the first crop to which the contract shall be applicable and the terms and conditions on which the association and the grower may cancel it; in the SEVENTEENTH the parties agree that there is no condition, promise, agreement or inducement outside the terms of the contract and that the same represents the Marketing Agreement executed by both parties; and the EIGHTEENTH provides that in case of the death of the grower, his heirs, his successors or assigns, shall be bound to fulfil the contract."

Contracts similar to this have been interpreted as either of sale, of agency or of trust.[4]   It should be noticed that § 15 of Act No. 70, *supra*, authorizes the cooperatives and the growers to enter into contracts of sale as well as of agency, however, the provisions of the contract discussed herein are in our opinion typical of a contract of sale.   Not only because of the name given to the agreement but because of its contents, it clearly appears that the intention of the parties was that the growers sell to the cooperatives and bind themselves to deliver all the tobacco produced or purchased by them and in addition they agreed that the absolute title of the same passed to the cooperatives as soon as the tobacco had a potential existence authorizing the cooperatives to mix the tobacco delivered by the different growers and thus mixed, to resell it at the highest marketable price and to pay the growers the net amount received after having deducted any advance payment and its interest, warehouse expenses and management, etc.   It further provides for the payment of $5 by the growers to the cooperatives for each hundredweight of tobacco which they may fail to deliver as fixed damages for breach of contract; it being further provided that the cooperatives shall be entitled to an injunction to

---

[4] See Interpretation of Contracts Employed by Cooperative Marketing Association, 43 Yale L. J. 119–127;  The Law of Co-operative Marketing by Theodore R. Meyer, 15 Cal. L. Rev. 85;  Cooperative Marketing Associations by Gerard G. Henderson, 23 Col. L. Rev. 91.

enjoin the growers from the nonperformance of the contract in case that they fail to deliver the tobacco and to a decree of specific performance of the contract. The cooperatives are also entitled to obtain loans for any purpose of the association, on security of the tobacco delivered and with the money thus obtained to make advance payments to the growers authorizing them in addition to sell or export all or any portion of the tobacco.

According to § 1334 of the Civil Code, 1930 ed., by a contract of purchase and sale one of the contracting parties binds himself to deliver a specified thing and the other to pay a certain price therefor in money or in something representing the same, and the price of securities, grain, liquids, and of other perishable things shall also be considered as certain, pursuant to § 1337 of the Civil Code, when it is agreed to pay the price which the thing sold may have on a certain day or in any particular exchange or market, or when a certain amount is fixed above or below the price ruling on such day, in the change or market, provided the price be certain. The growers bound themselves by the contract to deliver and they did deliver their tobacco to the cooperatives which agreed to pay the best marketable price less the afore-mentioned discounts. It was agreed that the title to the tobacco would pass to the cooperatives on delivery—and even though the tobacco would have a potential existence, a matter which is not involved in the present case [5]—the price was to be paid when the cooperatives would resell the tobacco, which agreement is valid under § 1339 of the Civil Code which provides that the sale shall be perfected between vendor and vendee and shall be binding on both of them, if they have agreed upon the thing which is the object of the contract and upon the price, even if neither has been delivered.

---

[5] However see the following cases sustaining the validity of similar clauses: *Hogue-Kellogg Co.* v. *Baker*, 47 Cal. App. 247, 190 Pac. 493; *Turner, Kuhn and Fraser* v. *Jones*, 61 Cal. App. 732, 215 Pac. 1033; *Black* v. *Solano Co.*, 299 Pac. 843; cf. *Western Oil and Refining Co.* v. *Venango Oil Co.*, 16 P. 2d 190.

For the purposes of Act No. 151 of 1937, *supra,* the taxable event took place when the growers delivered the tobacco purchased by the cooperatives. *Central Victoria* v. *Buscaglia, Treas.,* 63 P.R.R. 873; *West India Oil Co. (P. R.)* v. *Treas.,* 54 P.R.R. 695, 108 F. 2d 144, 311 U. S. 20.

Since appellee was not the first purchaser of the tobacco in this case it was not bound to pay the tax imposed by Act No. 151 of 1937, *supra.*

Although based on other reasonings, the judgment appealed from will be affirmed.

Mr. Justice Snyder did not participate herein.