Julian **BOND**, Dr. Martin Luther King, Jr., and Mrs. Arel Keyes, for themselves jointly and severally, and for all other similarly situated, Plaintiffs,

v.

James "Sloppy" **FLOYD** et al., Defendants.

Civ. A. No. 9895.

United States District Court
N. D. Georgia,
Atlanta Division.

Feb. 10, 1966.

Tuttle, Circuit Judge, dissented.

Howard Moore, Jr., Morris Brown, Charles Morgan, Jr., Atlanta, Ga., Melvin L. Wulf, New York City, for plaintiffs.

Arthur K. Bolton, Atty. Gen., State of Georgia, Atlanta, Ga., for defendants.

Before TUTTLE and BELL, Circuit Judges, and MORGAN, District Judge.

GRIFFIN B. BELL, Circuit Judge, and MORGAN, District Judge:

Mr. Bond, one of the plaintiffs in this matter and a Negro, was refused his seat as a member of the House of Representatives of the General Assembly of Georgia. He was a Representative-elect, having been duly elected by the voters of House District No. 136 for the session of the General Assembly commencing January 10, 1966. This was a special election for a one year term made necessary by the reapportionment decision of this court. Toombs v. Fortson, N.D., Ga., 1965, 241 F.Supp. 65.

On the first day of the session, at which time Mr. Bond and other members of the House were to take the oath of office, Mr. Bond was asked to step aside because of challenges to his qualifications having been filed by seventy-five of the two-hundred-five members of the House. After the other members were sworn, including seven Negro representatives, petitions protesting the seating of Representative-Elect Bond were referred by the Speaker of the House to a special committee designated to hear the contest. This committee, after a hearing, recommended that he not be seated. This recommendation was accepted by the House and he was denied his seat by a vote of one hundred eighty-four to twelve.

Dr. King and Mrs. Keyes, the other plaintiffs, seek along with Mr. Bond to represent the citizens and voters of House District No. 136 as a class, and it is affirmatively alleged that they are Negro citizens of House District No. 136 and that they are registered voters. They allege that there are common questions of law and fact affecting the civil rights of Negroes to vote and to have members of their race represent them in the House of Representatives of the State of Georgia. It is undisputed that Dr. King and Mrs. Keyes are residents of the district, but it is also undisputed that Dr. King is not registered to vote in the district but in the House District No. 132.

The defendants are the Speaker of the House, the Speaker Pro-Tem, several members of the House representing the membership, certain officers of the House, and the Secretary of State of the State of Georgia. Jurisdiction for declaratory and injunctive relief is asserted under 28 U.S.C.A. §§ 1331, 1343(3), 1343(4), and 2201; and 42 U.S.C.A. §§ 1971(d), 1983, and 1988. Three-Judge District Court jurisdiction was premised on 28 U.S.C.A. § 2281 by a claim that the provision of the Georgia Constitution which permits the members of the House to judge the qualifications of its members, and House Rule 61 which embodies the same provision are unconstitutionally vague, or were unconstitutionally administered with respect to Mr. Bond.

The additional causes of action set forth in the complaint were refined by briefs into claims that Mr. Bond was barred from membership because he was a Negro; that the action of the House denied him his First Amendment right to free speech; that he was denied procedural due process as guaranteed by the due process clause of the Fourteenth Amendment; that he was denied substantive due process in that there was no rational basis for the action of the House; that the House resolution barring Mr. Bond constituted an *ex post facto* law and a bill of attainder; and that the House action deprived the residents of the House District No. 136 of a republican form of government, equal protection of the law under the Fourteenth Amendment, and the right as Negroes under the Fifteenth Amendment to vote. The prayer is that defendants be enjoined from excluding Mr. Bond from membership in the House.

The defendants, by motion, have denied the jurisdiction of the court. Additionally, in the alternative, they have

moved to dismiss Dr. King and Mrs. Keyes as plaintiffs. They have also answered the complaint. It was stipulated that a final judgment might be rendered on the pleadings, the stipulated facts and such other evidence as was introduced on the hearing of this matter. We thus proceed to final disposition.

The facts which gave rise to the challenge to Mr. Bond stem from a statement issued on January 6, 1966 by the Student Nonviolent Coordinating Committee, an organization active in the civil rights field. Mr. Bond is and was Communications Director of this organization. After the statement was issued, Mr. Bond, upon inquiry, advised the news media that he supported the statement in its entirety. He added that he admired the courage of persons who burned their draft cards; that he was a pacifist who was eager and anxious to encourage people not to participate in the war in Viet Nam for any reason that they might choose; and said that as a second class citizen he did not feel that he should be required to support the war in Viet Nam.

The SNCC statement follows in full:

"The Student Nonviolent Coordinating Committee has a right and a responsibility to dissent with United States foreign policy on an issue when it sees fit. The Student Nonviolent Coordinating Committee now states its opposition to United States' involvement in Viet Nam on these grounds:

"We believe the United States government has been deceptive in its claims of concern for freedom of the Vietnamese people, just as the government has been deceptive in claiming concern for the freedom of colored people in such other countries as the Dominican Republic, the Congo, South Africa, Rhodesia and in the United States itself.

"We, the Student Nonviolent Coordinating Committee, have been involved in the black people's struggle for liberation and self-determination in this country for the past five years. Our work, particularly in the South, has taught us that the United States government has never guaranteed the freedom of oppressed citizens, and is not yet truly determined to end the rule of terror and oppression within its own borders.

"We ourselves have often been victims of violence and confinement executed by United States government officials. We recall the numerous persons who have been murdered in the South because of their efforts to secure their civil and human rights, and whose murderers have been allowed to escape penalty for their crimes.

"The murder of Samuel Young in Tuskegee, Ala., is no different than the murder of peasants in Viet Nam, for both Young and the Vietnamese sought, and are seeking, to secure the rights guaranteed them by law. In each case the United States government bears a great part of the responsibility for these deaths.

"Samuel Young was murdered because United States law is not being enforced. Vietnamese are murdered because the United States is pursuing an aggressive policy in violation of international law. The United States is no respecter of persons or law when such persons or laws run counter to its needs and desires.

"We recall the indifference, suspicion and outright hostility with which our reports of violence have been met in the past by government officials.

"We know that for the most part elections in this country, in the North as well as the South, are not free. We have seen that the 1965 Voting Rights Act and the 1964 Civil Rights Act have not yet been implemented with full federal power and sincerity.

"We question, then, the ability and even the desire of the United States government to guarantee free elections abroad. We maintain that our country's cry of 'preserve freedom in the world' is a hypcritical

mask behind which it squashes liberation movements which are not bound, and refuse to be bound, by the expediencies of United States cold war policies.

"We are in sympathy with, and support, the men in this country who are unwilling to respond to a military draft which would compel them to contribute their lives to United States agression in Viet Nam in the name of the 'freedom' we find so false in this country.

"We recoil with horror at the inconsistency of a supposedly 'free' society where responsibility to freedom is equated with the responsibility to lend oneself to military aggression. We take note of the fact that 16 percent of the draftees from this country are Negroes called on to stifle the liberation of Viet Nam, to preserve a 'democracy' which does not exist for them at home.

"We ask, where is the draft for the freedom fight in the United States?

"We therefore encourage those Americans who prefer to use their energy in building democratic forms within this country. We believe that work in the civil rights movement and with other human relations organizations is a valid alternative to the draft. We urge all Americans to seek this alternative, knowing full well that it may cost them lives—as painfully as in Viet Nam."

On the same day a newspaper reporter asked Mr. Bond for his views on the subject of the burning of draft cards. He stated that he would not burn his own but admired the courage of those who did.

During a taped interview with a representative of the media, Mr. Bond, after endorsing the SNCC statement was asked why he endorsed it, and his answer was as follows:

"Why, I endorse it, first, because I like to think of myself as a pacifist and one who opposes that war and any other war and eager and anxious to encourage people not to participate in it for any reason that they choose; and secondly, I agree with this statement because of the reason set forth in it—because I think it is sorta hypocritical for us to maintain that we are fighting for liberty in other places and we are not guaranteeing liberty to citizens inside the continental United States."

When asked if he thought his views were at variance with the duties that might be required of him as a Representative in the House of Representatives of the State of Georgia, Mr. Bond replied:

"Well, I think that the fact that the United States Government fights a war in Viet Nam, I don't think that I as a second class citizen of the United States have a requirement to support that war. I think my responsibility is to oppose things that I think are wrong if they are in Viet Nam or New York, or Chicago, or Atlanta, or wherever."

These facts were introduced before the House committee hearing the challenge. Mr. Bond was represented by counsel at the hearing and testified. He reaffirmed his adherence to all of these statements at the hearing and stated that they were still his views. There was no evidence then nor at the hearing before this court that Mr. Bond had receded in any way from his views. However, by way of explanation, he did state to the House committee that he had never suggested or advocated that anyone burn his draft card. He stated his willingness and desire to take the prescribed oath to support the Constitution of the United States and the State of Georgia.

The petitions challenging Mr. Bond which were before the special committee of the House contain several grounds, including the contention that Mr. Bond's actions and statements gave aid and comfort to the enemies of the United States, and also violated the Selective Service laws, 50 App., U.S.C.A. § 462(a) and (b),

and tended to bring discredit and disrespect on the House of Representatives.

The challenge was also on the basis that the statements and views of Mr. Bond disqualified him to take the oath to support the Constitution of the United States and the Constitution of Georgia as is required of a member of the House of Representatives. The theory was that Mr. Bond's statements were so repugnant to and inconsistent with his oath as to make it apparent that he could not honestly take the oath. This theory presents the central issue in the case.

## PENDING MOTIONS

Defendants moved to dismiss the complaint on the ground that the court lacks jurisdiction over the subject matter. Their view is that the determination of the qualifications of a member of the State House of Representatives is a matter which state law vests in the sole and exclusive jurisdiction of the House of Representatives, and that the federal questions asserted are insubstantial. They urge that the absence of any substantial question concerning deprivation of federally protected rights indicates that the action of the House is not subject to federal judicial review.

The extent of review under the circumstances will be discussed hereinafter under the merits of the controversy. However, we do hold that the court has jurisdiction over the subject matter of the complaint. It could hardly be argued that the House could refuse to seat a member because of his race or for any other reason amounting to an invidious discrimination under the equal protection clause of the Fourteenth Amendment. Cf. Baker v. Carr, 1962, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663. The denial of a seat to a Negro representative-elect would also violate the Fifteenth Amendment. Cf. Gomillion v. Lightfoot, 1960, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110. We think it follows that the court has

jurisdiction over a denial of First Amendment rights by the state, and that the federal rights asserted here are not so insubstantial as to warrant our refusing jurisdiction. The motion of the state to dismiss will be overruled and an order may be presented accordingly.

The defendants also have motions pending to strike the plaintiffs King and Keyes on the ground that they do not have such a direct interest in the litigation as would give them standing. They base their standing on an absence of representation in the House because Mr. Bond was deprived of his seat. The Governor has called an election for February 23, 1966 to fill the vacant seat.[1]

It is settled that one seeking to challenge the constitutionality of the statute must show that he has sustained or is in danger of sustaining some immediate direct injury. Liverpool, N. Y. and P. Steamship Company v. Comm. of Emigration, 1885, 113 U.S. 33, 5 S.Ct. 352, 28 L.Ed. 899; Commonwealth of Massachusetts v. Mellon, 1923, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078. Dr. King and Mrs. Keyes have not " * * * alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues * * * ." necessary in determining constitutional questions. Baker v. Carr, supra.

In a case involving the temporary lack of representation because an United States Senator had been denied his seat pending inquiry into his election and qualifications, Barry v. United States ex rel. Cunningham, 1929, 279 U.S. 597, 49 S.Ct. 452, 73 L.Ed. 867, the court said:

"The temporary deprivation of equal representation which results from the refusal of the Senate to seat a member pending inquiry as to his election or qualifications is the necessary consequence of the exercise of a constitutional power, and no more deprives the state of its

---

1. Mr. Bond is a candidate for the vacant seat and is the only candidate. The qualifications closed on February 7, 1966. The General Assembly will adjourn its present session on Friday, February 18, 1966. There will be no other regular session of the General Assembly during the year 1966.

'equal suffrage' in the constitutional sense than would a vote of the Senate vacating the seat of a sitting member or a vote of expulsion."

We are of the opinion that plaintiffs King and Keyes do not have such a direct interest in the litigation as would give them standing to bring the complaint. This is particularly so in view of the fact that the complaint of Mr. Bond alone will resolve every conceivable issue. Moreover, Dr. King is not a registered voter in the House District in question. The motion of the state to dismiss as to these two plaintiffs will be granted and an order may be presented accordingly.

## THE MERITS

The contention that Mr. Bond was denied his seat because of his race was resolved adversely to him from the bench during the hearing of this matter. To support this contention it was urged that Mr. Bond was a Negro; that SNCC was a militant civil rights organization; and that the question of race was inextricably related to each and every statement forming the basis of the challenge. This logic would create license in the name of race. Furthermore, seven Negroes, as stated, were seated on the same day as representatives. Two served on the special challenge committee at the request of Mr. Bond; two Negro senators appeared before the committee as character witnesses for him; and two of the Negro representatives spoke on the floor of the House for him before the final vote. The charge of racial discrimination and thus of denial of equal protection of the law is without foundation in fact.

This ruling also disposes of any claim that Mr. Bond or the citizens and voters of House District No. 136 have been deprived of any right as Negroes under the equal protection clause of the Fourteenth Amendment or under the Fifteenth Amendment. For the reasons stated on the standing question we reject also the contention that the action of the House denied them a republican form of government. This is not even a justiciable issue. Baker v. Carr, supra.

The substantial issue in the case rests on the guaranty of freedom of speech or to dissent under the First Amendment as that amendment has long been applicable to the states under the due process clause of the Fourteenth Amendment. Gitlow v. People of State of New York, 1925, 268 U.S. 652, 45 S.Ct. 625, 69 L.Ed. 1138; De Jonge v. State of Oregon, 1937, 299 U.S. 353, 57 S.Ct. 255, 81 L.Ed. 278. But the inquiry does not end simply on the question of deprivation of First Amendment rights *per se*. Rather the inquiry must be in the context of two fundamental principles of government: separation of powers and state government under our system of federalism. The right of free speech would not long exist absent a government founded on these principles.

James Madison writing in Federalist No. 47 said with respect to the separation of powers doctrine:

> "The accumulation of all powers, legislative, executive, and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny."

And from the begining states have claimed and enjoyed the protection of the separation of powers principle as between their respective branches of government. This, to date, has been a part of our federalism.

Georgia adopted the separation of powers principle in its first Constitution. Art. I, Const. of 1777. McElreath, Constitution of Ga., § 239, p. 229. The Constitution of 1789, Art. I, § XIII, McElreath, supra, § 314, p. 243, provided that each House of the state legislature would be the judge of the elections, returns and qualifications of its own members and have the power to expel or punish for disorderly behavior. Similar provisions have been included in every other Georgia Constitution. Ga.Const. of 1798, Art. I, § XIII, McElreath, § 364, p.

253; Const. of 1861, Art. II, § IV, Par. I, McElreath, § 484, p. 286, Const. of 1865, Art. II, § IV, Par. I, McElreath, § 585, p. 304; Const. of 1868, Art. III, § IV, Par. I, McElreath, § 709, p. 328; Const. of 1877, Art. III, § VII, Par. I, McElreath, § 882, p. 361.

"Each House shall be the judge of the election, returns and qualifications of its members and shall have power to punish them for disorderly behavior, or misconduct, by censure, fine, imprisonment, or expulsion; but no member shall be expelled, except by a vote of two-thirds of the House to which he belongs."

This language is to be compared with Art. I, § 5, Clauses 1 and 2 of the Constitution of the United States:

"Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members, * * *." (Clause 1)

"Each House may determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two thirds, expel a Member." (Clause 2)

The Georgia courts have consistently refused to take jurisdiction over controversies having to do with the qualifications of legislators. The Senate or House, as happened to be the case, was deemed to have exclusive jurisdiction under the Georgia Constitution. Rainey v. Taylor, 1928, 166 Ga. 476, 143 S.E. 383; Fowler v. Bostick, 1959, 99 Ga. App. 428, 108 S.E.2d 720; and Beatty v. Myrick, 1963, 218 Ga. 629, 129 S.E.2d 764. This is the general law in this country. Indeed we believe that there is no case to the contrary, federal or state.

Plaintiff recognizes the separation of powers principle as such on both the federal and state levels. He argues however that it exists on the state level only insofar as it does not conflict with the Federal Constitution and must therefore give way to First Amendment rights in view of the vertical application of those rights to the states through the due process clause of the Fourteenth Amendment. This is a correct statement of the law subject to whatever rights were left by the Fourteenth Amendment to the state legislative branches for control of their internal affairs under our system of federalism. We thus must measure Mr. Bond's freedom to speak in this frame of reference.

Before attempting to resolve this new and substantial constitutional question we must concern ourselves with the threshhold question, not asserted by plaintiffs, of whether the legislature had the power under the state Constitution or laws to bar Mr. Bond. Our distinguished and able Chief Judge is of the firm view that no such power existed. He seems to find the power of expulsion, but limits the power of judging qualifications to those expressed in the Georgia Constitution. We believe this to be a restrictive view, unfounded in recognized authority and not in keeping with our history or the principle of separation of powers.

Judge Story gave the reasons for vesting exclusive jurisdiction in the legislative branch in such cases (Story, Comm. on the Const., Vol. II, § 831, p. 294):

"It is obvious, that a power must be lodged somewhere to judge of the elections, returns, and qualifications of the members of each house composing the legislature; for otherwise there could be no certainty, as to who were legitimately chosen members, and any intruder, or usurper, might claim a seat, and thus trample upon the rights, and privileges, and liberties of the people. Indeed, elections would become, under such circumstances, a mere mockery; and legislation the exercise of sovereignty by any self-constituted body. The only possible question on such a subject is, as to the body, in which such a power shall be lodged. If lodged in any other, than the legislative body itself, its independence, its purity, and even its existence and action may be destroyed, or put into imminent danger. No other body, but itself, can

have the same motives to preserve and perpetuate these attributes; no other body can be so perpetually watchful to guard its own rights and privileges from infringement, to purify and vindicate its own character, and to preserve the rights, and sustain the free choice of its constituents. Accordingly, the power has always been lodged in the legislative body by the uniform practice of England and America."

The Supreme Court in Re Chapman, 1897, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154, a case involving a senate investigation of the conduct of some of its members, said:

"Under the constitution, the senate of the United States has the power to try impeachments; to judge of the elections, returns, and qualifications of its own members; to determine the rules of its proceedings; punish its members for disorderly behavior, and, with the concurrence of two thirds, expel a member; and it necessarily possesses the inherent power of self-protection."

■■■ We believe a state legislative body necessarily possesses this same inherent power of self-protection if the separation of powers doctrine is to have any real meaning on the state level. And self-protection goes to the process of qualifications as well as expulsion.

In Hiss v. Bartett, 1855, 3 Gray 468, 63 Am.Dec. 768, the question concerned the legislative power to expel a member. The Massachusetts Constitution contained no such power but did contain the power to judge returns, elections and qualifications. The court said: ·

"The authority to be 'judge of the returns, elections, and qualifications of its own members,' does not limit their power; they are judges in other respects, in all respects."

Art. I, § 5, of the United States Constitution, as noted, provides that each House shall be the judge of the elections, returns and qualifications of its own members. Art. I, § 3 provides that no person shall be a representative unless he meets certain age, citizenship and residential requirements. In the Constitutional Convention there was an attempt to set up affirmative qualifications. During the debate on that draft which was later rejected, Mr. Dickinson of Delaware, opposed the formulation because it would be held to be exclusive. He stated that he was "against any recitals of qualifications in the Constitution. It was impossible to make a complete one, and a partial one would, by implication, tie up the hands of the Legislature from supplying omissions." Mr. Wilson of Pennsylvania took the same view, saying: "Besides a partial enumeration of cases will disable the Legislature from disqualifying odius and dangerous characters." (Proceedings in Congressional Record, 80th Congress, First Session, January 3, 1947, Vol. 93, p. 12, Senate debate on whether Senator Bilbo of Mississippi was disqualified.)

By way of a historical precedent, Mr. Bilbo was denied his seat in the United States Senate because, among other reasons, his views regarding the right of Negroes to vote were repugnant to the oath he would be required to take. The Senate did not believe that it was limited to the qualifications expressed in the Constitution.

See Willoughby, The Constitutional Law of the United States, 2nd ed., Vol. I, p. 610, where after discussing in § 340 the subject of qualifications for membership being determined by Congress, the author states:

"The instances which have been cited make it sufficiently clear that the Senate and House have repeatedly held it to be proper that they should consider whether or not persons should be admitted as Senators or Representatives even though possessing all of the qualifications prescribed by the Constitution for membership and bringing credentials in due form of their election."

In the case of Senator Reed Smoot of Utah who had been seated but whose

qualifications to continue as a Senator were questioned, the investigation committee recommended that he be expelled either for reason of his membership in a church that countenanced and encouraged polygamy and united church and state contrary to the spirit of the Constitution, or because he had taken an oath of such a nature and character that he is disqualified from taking the oath of office required of an United States Senator. The question was raised concerning the ability of the Senate to add qualifications other than those enumerated in the Constitution and was answered in the report as follows:

"If his conduct has been such as to be prejudicial to the welfare of society, of the nation, or its Government, he is regarded as being unfit to perform the important and confidential duties of a Senator, and may be deprived of a seat in the Senate, although he may have done no act of which a court could take cognizance." 1 Hind's Precedents, §§ 481–483.

This situation is analogous to the Georgia Constitution. There is nothing in it which limits qualifications of a legislator to those expressed therein. In point of fact there is at least one disqualification in the Georgia law which is not contained in the Constitution. Ga. Code, § 89–101, subd. 5, provides:

"The following persons are held and deemed ineligible to hold any civil office, and the existence of any of the following states of facts shall be a sufficient reason for vacating any office held by such person, but the acts of such person, while holding a commission, shall be valid as the acts of an officer de facto, viz:

\* \* \* \* \* \*

"Persons of unsound mind, and those who, from advanced age or bodily infirmity, are unfit to discharge the duties of the office to which they are chosen or appointed."

■ The qualifications and disqualifications of legislators in the Georgia Constitution are not all inclusive. In sum, we find nothing that would compel the House to seat a member if a reasonable basis, within the context of due process of law as we shall next discuss exists for the denial.

■ Having assumed jurisdiction, we come then to the main question of whether Mr. Bond was improperly denied his seat, but this question is prefaced by the test to be applied. With respect to the test, we hold that the free speech issue should be resolved in the context of giving effect to the separation of powers principle, and also our system of federalism to the extent that it permits self-government to the states under the supremacy of the Federal Constitution.

There is some authority for such an approach. On the federal level we have some guidance in the case of Barry v. United States ex rel. Cunningham, 1929, 279 U.S. 597, 49 S.Ct. 452, 73 L.Ed. 867. That case arose out of the refusal to seat Senator Vare because of alleged corruption in his election. The issue was over whether the District Court could grant relief to a witness who had been arrested by the Senate because he refused to testify at the subsequent inquiry. The Supreme Court pointed out that the Senate was acting within its constitutional powers which were judicial in character and refused relief. It was said:

"Here the question under consideration concerns the exercise by the Senate of an indubitable power; and if judicial interference can be successfully invoked, it can only be upon a clear showing of such arbitrary and improvident use of the power as will constitute a denial of due process of law. That condition we are unable to find in the present case."

On the state level, with respect to state elections and thus giving effect to federalism but in no way involving the separation of powers principle, we begin with Wilson v. State of North Carolina,

1898, 169 U.S. 586, 18 S.Ct. 435, 42 L.Ed. 865. There the governor suspended a railroad commissioner and refused him a hearing. The Supreme Court refused relief. In Snowden v. Hughes, 1944, 321 U.S. 1, 64 S.Ct. 397, 88 L.Ed. 497, a candidate for the state senate alleged that the State Primary Canvassing Board denied him his rights under the equal protection clause by a willful, malicious and arbitrary refusal through a conspiracy to correctly certify the results of a primary election thereby eliminating him as a candidate. He brought his suit in the District Court under the Civil Rights Act of 1871. The Supreme Court refused relief on the ground that his case did not rise to the level of invidious, purposeful discrimination cognizable under the equal protection clause of the Fourteenth Amendment. The applicable rule of the case is to be found in the dissenting opinion of Mr. Justice Douglas, as follows.

"My disagreement with the majority of the Court is on a narrow ground. I agree that the equal protection clause of the Fourteenth Amendment should not be distorted to make the federal courts the supervisor of the state elections. That would place the federal judiciary in a position 'to supervise and review the political administration of a state government by its own officials, and through its own courts' (Wilson v. State of North Carolina, 169 U.S. 586, 596, 18 S.Ct. 435–439, 42 L.Ed. 865, 871)—matters on which each State has the final say. I also agree that a candidate for public office is not denied the equal protection of the law in the constitutional sense merely because he is the victim of unlawful administration of a state election law. I believe, as the opinion of the Court indicates, that a denial of equal protection of the laws requires an invidious, purposeful discrimination. But I depart from the majority when it denies Snowden the opportunity of showing that he was in fact the victim of such discriminatory action

His complaint seems to me to be adequate to raise the issue. He charges a conspiracy to wilfully, maliciously and arbitrarily refuse to designate him as one of the nominees of the Republican party, that such action was an 'unequal' administration of the Illinois law and a denial to him of the equal protection of the laws, and that the conspiracy had that purpose. ＊ ＊ ＊ ＂

 Snowden v. Hughes, as well as Baker v. Carr, supra, at least teach that there must be a showing of invidious, purposeful discrimination to give rise to relief under the equal protection clause. Here we have the due process clause and First Amendment rights. We think these cases show that some restraint is to be practiced by the courts in considering state political questions concerning particular offices as distinguished from whole systems such as are prevalent in malapportionment, or racial discrimination. If this premise be correct, then there is room for a balance between the separation of powers principle, a system of federalism and individual rights afforded under the federal Constitution.

 Being of this view, we conclude that a reasonable test under circumstances such as are presented in this case would be to assume jurisdiction for the purpose of determining whether Mr. Bond was denied due process of law, either procedural or substantive. Notice, an opportunity to be heard, to be represented by counsel, to testify and to offer evidence and to cross-examine adverse witnesses are envisioned in procedural due process. The transcript of the hearing which was held on the challenge to Mr. Bond demonstrates no absence of due process. It is true that there was no subpoena power but no request for an absent witness was made. We reject the contention that procedural or substantive due process was violated by allowing the challengers to vote. A holding to the contrary would do violence to the power to judge qualifications.

As to substantive due process, we conclude that there must be a rational evidentiary basis for the ruling of the House to deny Mr. Bond his seat. The act must not have been arbitrary.

Does the action rest on any evidence which would support the denial? Thompson v. City of Louisville, 1960, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654, 80 A.L.R.2d 1355; Garner v. State of Louisiana, 1961, 368 U.S. 157, 82 S.Ct. 248, 7 L.Ed.2d 207.

 Mr. Bond's right to speak and to dissent as a private citizen is subject to the limitation that he sought to assume membership in the House. As such he was required to take an oath to support the Constitution of the United States. This is a legitimate requirement. Indeed, the Federal Constitution requires it. Art. VI, § 3. One of the charges against him was that his statements were inconsistent with and repugnant to that oath. Was there any basis for this charge?

The SNCC statement is at war with the national policy of this country: To make certain that every citizen stands equal before the law; to make certain that every citizen has a fair chance to benefit in the freedom and opportunities and bounties of this country; to export these same principles of democracy to the balance of the world wherever and whenever possible, even to the extent of lending military assistance where self-determination is denied in order that those denied may choose freedom if they so desire. A citizen would not violate his oath by objecting to or criticizing this policy or even by calling it deceptive and false as the statement did.

But the statement does not stop with this. It is a call to action based on race; a call alien to the concept of the pluralistic society which makes this nation. It aligns the organization with " * * * colored people in such other countries as the Dominican Republic, the Congo, South Africa, Rhodesia * * *" It refers to its involvement in the black people's struggle for liberation and self-

determination * * *". It states that "Vietnamese are murdered because the United States is pursuing an aggressive policy in violation of international law." It alleges that Negroes, referring to American servicemen, are called on to stifle the liberation of Viet Nam.

The call to action, and this is what we find to be a rational basis for the decision which denied Mr. Bond his seat, is that language which states that SNCC supports those men in this country who are unwilling to respond to a military draft. The fact that the last paragraph calls on them to devote their energies to the alternative of working in the civil rights movement in no way avoids the fact that the organization offers support to men who are unwilling to respond to a military draft. Cf. Gara v. United States, 6 Cir., 1949, 178 F.2d 38.

Mr. Bond was careful to affirm this statement. He went further, and he was more than a private citizen; he was an officer and employee of SNCC and was about to become a member of the House of Representatives of Georgia. He stated that he admired the courage of anyone who burned his draft card. He stated that as a pacifist he was eager and anxious to encourage people not to participate in the war in Viet Nam or in any other war for any reason that they choose, and lastly, he stated that, as a second class citizen, he did not think that he had the requirement to support the war in Viet Nam.

The Congress has the obligation under the Federal Constitution for providing for the common defense of this nation. The Selective Service System is a part of that defense. We are committed in Viet Nam. The Congress approved this course in Public Law 88–408, August 10, 1964, 78 Stat. 384, wherein the president was empowered to take all necessary measures to repel any armed attack against the forces of the United States and to prevent further aggression from the campaign being waged by the " * * * Communist regime in North Vietnam." This resolution states that the United States " * *

regards as vital to its national interest and to world peace the maintenance of international peace and security in southeast Asia."

Whether Mr. Bond should have been seated was a question which presented itself to the House of Representatives of Georgia under our system. Whether the wisest course was followed is not for us to say. The judgment of the court is not to be substituted for that of the House. Our function is to determine whether he has been denied some fundamental federal right to which he was otherwise entitled. We find and hold that his statements and affirmation of the SNCC statement as they bore on the functioning of the Selective Service System could reasonably be said to be inconsistent with and repugnant to the oath which he was required to take. This suffices as a rational basis for the action of the House. The fact that the statement was otherwise freighted with racial overtones and was at variance with the established national concept of a country accommodating all nationalities and ethnic groups is a part of the basis of our holding only insofar as it relates to the call not to support the Selective Service System.

The charge that the constitutional provision of Georgia authorizing the House to judge the qualifications of its members and the House rule embodying it are unconstitutionally vague is without merit. It follows from what we have said that neither was unconstitutionally applied to Mr. Bond. It also follows from what we have said that the resolution denying Mr. Bond his seat was not an *ex post facto* law or a bill of attainder. To so hold in the face of a finding that there was a rational basis for the action of the House would be to destroy the constitutional power of judging qualifications.

All relief is denied and the complaint will be dismissed. Defendants may present a judgment accordingly.

TUTTLE, Circuit Judge (dissenting).

With deference I must dissent. I am convinced that Representative-elect Bond was illegally deprived of his seat in the House of Representatives of Georgia and that this court should so hold.

Julian Bond, the plaintiff in this action, was duly elected by the voters of his General Assembly District No. 136 as their representative in the House of Representatives of the Georgia General Assembly for the session commencing January 1, 1966. This is a one-year session, made necessary by this Court's previous decision requiring a reapportionment of the Georgia State Legislature.

Upon his presenting himself along with the other newly elected members of the House of Representatives, he was asked to step aside because challenges to his qualifications had been filed by some 75 members of the House. After the other members had been duly sworn in, a resolution protesting the seating of Representative-elect Bond was referred by the Speaker of the House to a special committee designated to hear the contest. The committee, after a hearing, recommended that he be not seated. This recommendation was accepted by the House, and he was denied his seat.

Since the first attack that is made is based upon the contention that the House exceeded its authority in voting to reject Bond, we turn first to a consideration of the provisions of the Georgia Constitution dealing with the qualifications and eligibility of members.

Article III, Section VII, Paragraph I, of the Georgia Constitution (§ 2–1901, Ga.Code Ann.) provides as follows:

"Election, returns, etc.; disorderly conduct.—Each House shall be the judge of the election, returns, and qualifications of its members and shall have power to punish them for disorderly behavior, or misconduct, by censure, fine, imprisonment, or expulsion, but no member shall be expelled, except by a vote of two-thirds of the House to which he belongs."

Article III, Section VI, Paragraph I, of the Constitution of the State of Georgia (§ 2–1801, Ga.Code Ann.) provides as follows:

"Qualifications of representatives. —The Representatives shall be citizens of the United States who have attained the age of twenty-one years, and who shall have been citizens of this State for two years, and for one year residents of the counties from which elected.

Article II, Section II, Paragraph I, of the Constitution of the State of Georgia (§ 2–801, Ga.Code Ann.) provides as follows:

"Registration of electors; who disfranchised.—The General Assembly may provide, from time to time, for the registration of all electors, but the following classes of persons shall not be permitted to register, vote, or hold any office, or appointment of honor, or trust in this State, to-wit: 1st. Those who shall have been convicted in any court of competent jurisdiction of treason against the State, of embezzlement of public funds, malfeasance in office, bribery or larceny, or of any crime involving moral turpitude, punishable by the laws of this State with imprisonment in the penitentiary, unless such persons shall have been pardoned. 2nd. Idiots and insane persons."

Article III, Section IV, Paragraph VI, of the Georgia Constitution (§ 2–1606, Ga.Code Ann.) provides as follows:

"Eligibility; appointments forbidden.—No person holding a military commission, or other appointment, or office, having any emolument, or compensation annexed thereto, under this State, or the United States, or either of them except Justices of the Peace and officers of the militia, nor any defaulter for public money, or for any legal taxes required of him shall have a seat in either house; nor shall any Senator, or Representative, after his qualification as such, be elected by the General Assembly, or appointed by the Governor, either with or without the advice and consent of the Senate, to any office or appointment having any emolument annexed thereto, during the time for which he shall have been elected, unless he shall first resign his seat, provided, however, that during the term for which he was elected no Senator or Representative shall be appointed to any civil office which has been created during such term."

Article VII, Section III, Paragraph VI, of the Constitution of the State of Georgia (§ 2–5606, Ga.Code Ann.) provides as follows:

"Profit on public money.—The receiving, directly or indirectly, by any officer of State or county, or member or officer of the General Assembly of any interest, profits or perquisites, arising from the use or loan of public funds in his hands or moneys to be raised through his agency for State or county purposes, shall be deemed a felony, and punishable as may be prescribed by law, a part of which punishment shall be a disqualification from holding office."

Article III, Section IV, Paragraph V, of the Georgia Constitution (§ 2–1605, Ga.Code Ann.) provides as follows:

"Oath of members.—Each senator and Representative, before taking his seat, shall take the following oath, or affirmation, to-wit: 'I will support the Constitution of this State and of the United States, and on all questions and measures which may come before me, I will so conduct myself, as will, in my judgment, be most conducive to the interests and prosperity of this State."

The foregoing provisions of the Georgia Constitution are the only stated qualifications or rules of eligibility contained in the State Constitution touching on the membership in either the Senate or the House of Representatives of the Georgia General Assembly.

Julian Bond was denied the right to take his oath as an elected member of the

Georgia House of Representatives by a resolution adopted by the said House on January 10, 1966, which said resolution was in the following language:

"Relative to the matter of the seating of Representative-Elect Julian Bond; and for other purposes.

"WHEREAS, a special committee created pursuant to H.R.No. 7 which was appointed for the purpose of holding a hearing on petitions challenging and contesting the seating of Representative-Elect Julian Bond of the 136th District has conducted a hearing in said matter; and

"WHEREAS, said committee has submitted a report in which it is recommended that Representative-Elect Julian Bond not be allowed to take the oath of office as a Representative of the House of Representatives and that he not be seated as a member of the House of Representatives.

"NOW, THEREFORE, BE IT RESOLVED BY THE HOUSE OF REPRESENTATIVES that the report of the aforesaid committee is hereby adopted and the recommendations contained therein shall be followed.

"BE IT FURTHER RESOLVED that Representative-Elect Julian Bond shall not be allowed to take the oath of office as a member of the House of Representatives and that Representative-Elect Julian Bond shall not be seated as a member of the House of Representatives.

"BE IT FURTHER RESOLVED that the Clerk of the House is hereby instructed to immediately transmit a copy of the aforesaid report and a copy of this resolution to the Governor, to the Secretary of State and to Representative-Elect Julian Bond."

The said resolution expressly "adopted" the report of the special committee which was appointed for the purpose of conducting, and did actually conduct, a hearing on the matter of the challenge to the seating of Representative-Elect Bond. The report of the committee follows:

"The Special Committee appointed pursuant to H.R. #7 conducted a hearing on January 10, 1966, beginning at 2:30 o'clock p. m., in the chamber of the House of Representatives, State Capitol, on the matter of petitions filed challenging and contesting the seating of Representative-Elect Julian Bond of the 136th District.

"Based upon testimony and the evidence and documents before this Committee, the Committee recommends that Representative-Elect Julian Bond not be allowed to take the oath of office as a member of the House of Representatives and that he not be seated as a member of the House of Representatives.

"This 10th day of January 1966."

The contest which was thus submitted to the special committee, and thereafter decided by the House, resulted from charges and specifications filed by certain members of the House of Representatives in two separate petitions which, in essential part, are as follows:

## PETITION I

### "COUNT I

"The Student Nonviolent Coordinating Committee, an organization and association of which Representative-Elect Julian Bond is a member, agent, and publicity director, has caused to be made certain statements concerning the position of the United States in the Viet Nam conflict, a copy thereof being attached hereto, marked Exhibit A and by reference made a part hereof, and the said Representative-Elect Julian Bond did publicly endorse, approve and confirm said statement.

### "COUNT II

"Said representative-elect has said that he admires the courage of those persons who burn their draft cards.

**1.**

"The actions and statements of said representative-elect show that he does not and will not support the Constitution of the United States and of the State of Georgia, as required by law (Constitution of Georgia, Article III, Section IV, Paragraph V (Code § 2–1605)); Constitution of the United States, Article VI, Section 3.

**2.**

"By said actions and statements, said representative-elect adheres to the enemies of the United States and of the State of Georgia, contrary to the Constitution of Georgia (Article I, Section II, Paragraph II) and of the United States (Article III, Section 3, Cl. 1).

**3.**

"By said actions and statements, said representative-elect gives aid and comfort to the enemies of the United States and of the State of Georgia, contrary to the Constitution of Georgia (Article I, Section II, Paragraph II) and of the United States (Article III, Section 3, Cl. 1).

**4.**

"Said actions and statements constitute a violation of the United States Code, Title 50 App., § 462(a).

**5.**

"Said actions and statements constitute a violation of the United States Code, Title 50 App., § 462(b), as amended.

**6.**

"The statements referred to above are reprehensible and are such as tend to bring discredit to and disrespect of the House of Representatives and constitute actions on the part of Representative-Elect Julian Bond sufficient to prevent him from being seated as a member of the House of Representatives.

**7.**

"Such actions and statements show that he is unqualified and ineligible to be a member of the House of Representatives."

EXHIBIT A TO PETITION I

"The Student Nonviolent Coordinating Committee has a right and a responsibility to dissent with United States foreign policy on an issue when it sees fit. The Student Nonviolent Coordinating Committee now states its opposition to United States' involvement in Viet Nam on these grounds:

"We believe the United States government has been deceptive in its claims of concern for freedom of the Vietnamese people, just as the government has been deceptive in claiming concern for the freedom of colored people in such other countries as the Dominican Republic, the Congo, South Africa, Rhodesia and in the United States itself.

"We, the Student Nonviolent Coordinating Committee, have been involved in the black people's struggle for liberation and self-determination in this country for the past five years. Our work, particularly in the South, has taught us that the United States government has never guaranteed the freedom of oppressed citizens, and is not yet truly determined to end the rule of terror and oppression within its own borders.

"We ourselves have often been victims of violence and confinement executed by United States government officials. We recall the numerous persons who have been murdered in the South because of their efforts to secure their civil and human rights, and whose murderers have been allowed to escape penalty for their crimes.

"The murder of Samuel Young in Tuskegee, Ala., is no different than the murder of peasants in Viet Nam, for both Young and the Vietnamese sought, and are seeking, to secure the

rights guaranteed them by law. In each case the United States government bears a great part of the responsibility for these deaths.

"Samuel Young was murdered because United States law is not being enforced. Vietnamese are murdered because the United States is pursuing an aggressive policy in violation of international law. The United States is no respector of persons or law when such persons or laws run counter to its needs and desires.

"We recall the indifference, suspicion and outright hostility with which our reports of violence have been met in the past by government officials.

"We know that for the most part, elections in this country, in the North as well as the South, are not free. We have seen that the 1965 Voting Rights Act and the 1964 Civil Rights Act have not yet been implemented with full federal power and sincerity.

"We question, then, the ability and even the desire of the United States government to guarantee free elections abroad. We maintain that our country's cry of 'preserve freedom in the world' is a hypocritical mask behind which it squashes liberation movements which are not bound, and refuse to be bound, by the expediencies of United States cold war policies.

"We are in sympathy with, and support, the men in this country who are unwilling to respond to a military draft which would compel them to contribute their lives to United States aggression in Viet Nam in the name of the 'freedom' we find so false in this country.

"We recoil with horror at the inconsistency of a supposedly 'free' society where responsibility to freedom is equated with the responsibility to lend oneself to military aggression. We take note of the fact that 16 percent of the draftees from this country are Negroes called on to stifle the liberation of Viet Nam, to preserve a "democracy" which does not exist for them at home.

"We ask, where is the draft for the freedom fight in the United States?

"We therefore encourage those Americans who prefer to use their energy in building democratic forms within this country. We believe that work in the civil rights movement and with other human relations organizations is a valid alternative to the draft. We urge all Americans to seek this alternative, knowing full well that it may cost them lives—as painfully as in Viet Nam."

### PETITION II

"(1) That the Constitution of Georgia, Article III, Section VII, Paragraph 1 provides that each House shall be the judge of the election, returns, and qualifications of its members.

"(2) That the Constitution of Georgia, Article III, Section IV, Paragraph 5, specifically requires each senator and representative, before taking their seat, to take the following oath or affirmation, to-wit:

'I will support the Constitution of this State and of the United States, and on all questions and measures which may come before me, I will so conduct myself, as will, in my judgment, be most conducive to the interest and prosperity of this State.'

"That the said Julian Bond has specifically and publicly endorsed in full a policy statement of an organization known as the Student Non-Violent Coordinating Committee, which statement reads as follows:

'We are in sympathy with, and support, the men in this country who are unwilling to respond to a military draft which would compel them to contribute their lives to United States aggression in Viet Nam in the name of the "free-

dom" we find so false in this country.'

'We recoil with horror at the inconsistency of a supposedly free society where responsibility to freedom is equated with the responsibility to lend oneself to military aggression. We take note of the fact that 16 per cent of the draftees from this country are Negroes called on to stifle the liberation of Viet Nam, to preserve a "democracy" which does not exist for them at home * * *'

'We, therefore, encourage those Americans who prefer to use their energy in building democratic forms within this country. We believe that work in the civil rights movement and with other human relations organizations is a valid alternative to the draft. We urge all Americans to seek this alternative, knowing full well that it may cost them their lives—as painfully as in Viet Nam.'

"(4) That the said Julian Bond is not qualified under the Constitution of Georgia to take the oath as a Member of the House of Representatives representing the 136th Representative District of Fulton County, Georgia, inasmuch as his full endorsement of the aforesaid policy statement of the Student Non-Violent Coordinating Committee is totally and completely repugnant to and inconsistent with the mandatory oath prescribed by the Constitution of Georgia for a Member of the House of Representatives to take before taking his seat.

"(5) That the said Julian Bond cannot justly and honestly take the aforementioned mandatory constitutional oath which requires him to uphold the Constitution of the United States and the Constitution of Georgia, having endorsed the aforesaid subversive policy statement."

At the Committee hearing, the proponents of the contest sought to substantiate their claim by having played into the record a taped newscaster's interview with Mr. Bond which, although not made by him as a public statement upon his own initiative in the normal manner of making a hortatory expression, was made, it may be assumed, with the knowledge that it would be broadcast by the newscaster. The Committee also invited from Mr. Bond his comment. He stated to the Committee that he "did support" the statement of the SNCC, quoted above, in its entirety.

In support of the charge that Bond had "said that he admires the courage of those persons who burn their draft cards", the following question was asked: "Do you admire the courage of persons who burn their draft cards?" after which, the following question and answers occurred:

"A. I admire people who take an action, and I admire people who feel strongly enough about their convictions to take an action like that knowing the consequences that they will face, and that was my original statement when asked that question.

"Q. Do you still adhere to that statement?

"A. Yes, I do.

"Q. Let me see if I have your statement correct, that you admire people who are willing to take the consequences, to stand up for their principles, is that substantially what you said?

"A. That is correct.

"Q. And does that admiration of such people go to taking such a stand, when such a stand is in violation of a valid law of the United States?

"A. I have never suggested or counseled or advocated that anyone other person burn their draft card. In fact, I have mine in my pocket and will produce it if you wish. I do not advocate that people should break laws. What I simply try to say was that I admired the courage of someone who could act on his convictions

knowing that he faces pretty stiff consequences.

"Q. So that you admire the courage of the persons in the given instance who burn their draft cards, or who were willing to take the consequences for burning their draft cards?

"A. That is right."

In a written response to the charges and during the proceedings Representative Bond stated his willingness and desire to take the oath to support the Constitutions of the United States and the State of Georgia as prescribed by the Georgia Constitution.

It is clear that the refusal to seat this elected representative was upon the charge, adequately proven, of his stated support in an interview with a newsman and subsequently in the corridor of the House of Representatives (after the challenge had been referred to the Committee) of the SNCC statement and his views touching on the draft card matter.

The suit before us challenges the authority of the House of Representatives, under the provision making it "the Judge of the * * * qualifications of its members" to deny an elected member, the right to be seated for any lack of qualifications not specifically prescribed in the Georgia Constitution. Further, the complaint asserts that the actual ground of his rejection as a member was the disapproval by the House of his conduct, to-wit: the expression of the extremely unpopular (characterized as illegal and disloyal by the proponents of the contest) views as above set out; that a denial of his seat because of such conduct constitutes an abridgment by the State of Georgia of Bond's freedom of speech in violation of the guarantee of the First Amendment to the United States Constitution, which guarantee is made effective as against State action by "absorption" into the guarantee of due process by the Fourteenth Amendment. See Palko v. State of Connecticut, 302 U.S. 319, 324, 326, 58 S.Ct. 149, 82 L.Ed. 288.

The complaint requires the convening of a three-judge District Court under Title 28, Section 2281, United States Code Annotated, because it charges that if Article III, Section VII, Paragraph 1 of the Georgia Constitution, supra (making each House the judge of the qualifications of its members), is construed in the manner in which it was applied in this case, then the said Section of the Georgia Constitution is invalid under the Fourteenth Amendment. Once convened properly, such a court has jurisdiction to decide every question involved in the litigation, state as well as federal. Public Service Commission of State of Missouri v. Brashear Freight Lines, 312 U.S. 621, 61 S.Ct. 784, 85 L.Ed. 1083; R.R. Comm. of State of Calif. v. Pacific Gas & Electric Company, 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319.

It is a basic principle of jurisprudence that if, by construction of a statute in a manner that will make it constitutional, this avoids the question whether the statute, differently construed, would be unconstitutional, a court should first construe the statute with an eye to the avoiding of the constitutional question if possible. See Rescue Army, et al. v. Municipal Court of City of Los Angeles, 331 U.S. 549, 568, 67 S.Ct. 1409, 91 L.Ed. 1666, et seq.

Thus, we look first to determine whether the challenged provision of the Georgia Constitution may properly be construed so as to permit the unseating of Representative-Elect Bond on the grounds stated. Of course, if the Georgia Supreme Court had construed the statute in such a manner this construction of the Georgia Constitution would be binding on us. The Court has not so construed it.

The State of Georgia claims that, at least within the factual context of this contest, the power of the House of Representatives to judge Bond's qualifications is "plenary." It offers, in support of this proposition, three Georgia Court decisions: Rainey v. Taylor, 166 Ga. 476, 143 S.E. 383 (1928); Beatty v. Myrick, 218 Ga. 629, 129 S.E.2d 764 (1963); and Fowler v. Bostick, 99 Ga.App. 428, 108 S.E.2d 720 (1959).

In point of fact, in none of these Georgia decisions did the court determine that the House or Senate had absolute and final jurisdiction to judge whether the contesting parties lacked qualifications *which are not expressly stated as "qualifications" or rules of "eligibility" in the Georgia Constitution.*

The Rainey case dealt with a charge by one Taylor, in a *quo warranto* proceeding against Rainey, that Rainey was, at the time of his election to the Georgia General Assembly, an acting superintendent of Schools. It being provided in the Georgia Constitution that the "qualifications of members" is to be decided by the House of Representatives, and, the Constitution in what is now Section 2–1606, quoted supra, providing that the holder of another state office "shall not have a seat in either House," it was a question for the General Assembly to judge whether Rainey was disqualified under a *stated* ground in the constitution. The Court merely held that a rule of "eligibility" was comprehended within the term "qualifications."

In the subsequent case of Beatty v. Myrick, in a headnote opinion, the Supreme Court of Georgia stated that the question was which of two named candidates was legally *elected* to represent the Third Senatorial District in the State Senate. There was thus no question of testing the "qualifications" of the senator-elect. It was simply a matter of judging who was the winner of the election. This question is expressly confided by the Constitution to the State Senate.

Fowler v. Bostick was in all respects similar to the Rainey case. It was an action for a declaratory judgment seeking to disqualify Bostick as ineligible to be seated as Representative of Tift County because he was, at the time, alleged to hold the office of Clerk of the Superior Court of Tift County. Here, as in Rainey, the court was asked to determine whether an elected member met the *qualifications expressly stated* in the Georgia Constitution. Of course, no criticism can be made of such a decision as these three by the Georgia courts. The question,

not before the Court there, is whether, under the Georgia Constitution, the Legislature can find a lack of qualifications beyond those *expressly provided* for in the Constitution itself and as set out above.

In the absence of a strong showing of judicial interpretation to the contrary, it would seem that simple justice would require a holding that where specific qualifications are stated for an office and the Legislature is given the power to judge whether an aspirant for the office is "qualified", the legislature, as judge, should be required to look to the stated qualifications as the measuring stick. To hold to the contrary and permit the House as judge to go at large in a determination of whether Representative-Elect "A" meets undefined, unknown and even constitutionally questionable standards shocks not only the judicial, but also the lay sense of justice.

It can be readily understood why there are few legal precedents to give guidance in such a situation. In the first place, it can be assumed that members of a state or national legislature are prone to recognize the right of the electorate to choose as their representative whom they want to serve them. Thus, there may not be expected to be many clear precedents. Further it is readily apparent that in those cases in which a legislative body has exceeded its authority the shortness of the term of office may make moot any contest in court.

Nevertheless, there are some legislative precedents. In a New York state general election held on November 4, 1919, five members of the Socialist party were elected as members of the General Assembly of the State of New York. They appeared and took the oath of office, and thereupon, as soon as the House was organized, a motion was made to deprive them of their rights to participate, or, in other words, to expel them from membership in the House. A resolution for such expulsion was submitted and referred to a committee which conducted hearings resulting in a resolution to expel, and the mem-

bers were later, by action of the Legislature, expelled from membership.

During the pendency of the hearings, the annual meeting of the Association of the Bar of the City of New York adopted a resolution authorizing appointment of a committee "to appear before the Assembly or its Judiciary Committee and take such action as may in their judgment be necessary to safeguard and protect the principles of representative government guaranteed by the Constitution, which are involved in the proceedings now pending."

This Committee, under the Chairmanship of Honorable Charles E. Hughes, a former Governor of the state of New York and a former member of the United States Supreme Court who resigned to be a candidate for the presidency of the United States in the elections in 1916, and who later was reappointed to the Supreme Court of the United States and became Chief Justice, and including in its membership Honorable Joseph M. Proskauer, later an eminent New York Supreme Court Justice, and Honorable Ogden L. Mills, who later became Secretary of the Treasury of the United States, (the other members, Honorable Morgan J. O'Brien and Honorable Louis Marshall, all doubtless men of similar public spirit and competence, but their names do not at the moment call to mind the character of their other public service) filed a careful brief, because, as the Committee said, they regarded "these proceedings as inimical to our instutions, because they tend to subvert the very foundation upon which they rest—representative government." In the course of the discussion of the situation then pending, the Committee made it plain that the action was an action for expulsion rather than an action to determine the qualifications of the members under the provisions of the New York Constitution similar to that of the State of Georgia. In pointing to the reason why they considered the pro-

ceedings not a testing of "the qualifications" of the members, they cited from the proceedings of the United States Senate, in which Senator Reed Smoot, of Utah, was the subject of proceedings attacking his membership in the United States Senate on the charge that he was one of the twelve apostles of the Mormon Church, and, therefore, a prominent member of the hierarchy, and, though not a polygamist, sanctioned polygamy, a practice prohibited by the organic act of Congress admitting Utah as a state.

In the course of the Smoot proceedings, Senator Philander C. Knox, a distinguished Senator from the state of Pennsylvania, discussed the question of testing the qualifications of a member of the Senate under the United States Constitutional provisions that are similar to those in Article III, Section IV, par. V, etc., set out above. His statement is a complete answer to the claim that a legislature may require any qualifications it chooses. Senator Knox said:

"I have intentionally referred to the proposed action against Senator Smoot as expulsion. I do not think the Senate will seriously consider that any question is involved except one of expulsion, requiring a two-thirds vote.[1] There is no question as to Senator Smoot possessing the qualifications *prescribed by the Constitution* and therefore we cannot deprive him of his seat by a majority vote. *He was, at the time of his election, over 30 years of age and had been nine years a citizen of the United States, and when elected was an inhabitant of Utah. These are the only qualifications named in the Constitution, and it is not in our power to say to the States, 'these are not enough; we require other qualifications,' or to say that we cannot trust the judgment of the states in the selection of Senators, and we, therefore, insist upon the right to disap-*

1. Under the United States Constitution, a majority of the Senate could find a Senator not qualified, whereas it required a two-thirds vote to expel a member. This is similar to the Georgia Constitution.

*prove them for any reason. This claim of right to disapprove is not even subject to any rule of the Senate specifying additional qualifications of which the states have notice at the time of selecting their senators, but it is said to be absolute in each case as it arises, uncontrolled by any canon or theory whatever * *. Subject to these limitations imposed by the Constitution, the states are left untrammeled in their right to choose their senators."* (Emphasis supplied.)

The record discloses that the Senate declined to expel or otherwise deny Senator Smoot his right to sit. However, the five members of the New York State Legislature, whose cause was so eloquently presented by the Hughes Committee, did not fare so well. They were denied their seats.

Expressing their own views again on the question of the power of the Legislature to disqualify a member for grounds other than those stated in the Constitution, the Hughes Committee stated:

"We contend that the opinion expressed by Senator Knox in the case of Senator Smoot, supra, correctly defines what is meant by qualification. The constitution expressly specifies a number of disqualifications [as is also true in the Georgia Constitution] . . . The principle of constitutional interpretation applicable to this phase of the subject was elaborated in classic phrase by Chancellor Sanford in Barker v. People, 3 Cowen, 703, which, although decided in 1824, and therefore involving the interpretation of an earlier Constitution, is nevertheless as applicable in principle to the present Constitution: 'Eligibility to public trust, is claimed as a constitutional right, which cannot be abridged or impaired. The Constitution established and defines the right of suffrage; and gives to the electors and to their various authorities, the power to confer public trust

* * *. Excepting particular exclusions thus established, the electors and the appointing authorities are, by the Constitution wholly free to confer public stations upon any person, according to their pleasure. The Constitution giving the right of election and the right of appointment; these rights consisting essentially in the freedom of choice; and the Constitution also declaring, that certain persons are not eligible to office; it follows from these powers and provisions, that all other persons are eligible. Eligibility to office is not declared as a right or principle, by any expressed terms of the Constitution; but it results, as a just deduction, from the expressed powers and provisions of the system. The basis of the principle, is the absolute liberty of electors and the appointing authorities, to choose and to appoint any person, who is not made ineligible by the Constitution * * * I, therefore, conceive it to be entirely clear that the Legislature cannot establish arbitrary exclusions from office or any general regulation requiring qualifications, which the Constitution has not required.' * * * He would be indeed a bold individual who would assert that any American Legislative body can set up an arbitrary standard of qualification of its members that finds no sanction in the general will of the people and that is contrary to the spirit of the Constitution * * *." Brief of Special Committee appointed by the Association of the Bar of the City of New York, January 20, 1920. (Emphasis supplied.)

A number of actions of the United States House of Representatives or the United States Senate are cited by the State as illustrative in its argument that the term "qualification," is broad enough to encompass a test of the representative elect's general character and loyalty. Based upon the excerpts from these cases as contained in the State's brief, each of them is to be distinguished.

The first of these cases is that of Victor Berger, a Congressman from Wisconsin, who had served in the House from 1911 to 1913. In 1918, he was again elected to the 66th Congress. Before appearing to be sworn in, he was indicted by the grand jury in the United States District Court for the violation of the Espionage Act. He was found guilty and sentenced to 20 years imprisonment. The appeal was pending at the time he offered to take the oath of office in the United States Congress. The House of Representatives adopted the report of the Committee, which found that "the question was 'whether or not Victor L. Berger was guilty of a violation of the Espionage Act, whether or not he did give aid or comfort to the enemies of the United States during the war with Germany [which, of course, in time of war, would amount to treason under the Constitution of the United States] and whether or not he was ineligible to a seat in the House of Representatives." The Committee found "after a careful consideration of all the evidence, in the opinion of your committee, the admitted acts, writings, and declarations of Victor L. Berger * * * giving such acts in the language of the writings and declarations their ordinary, everyday meaning, and without considering any other evidence, clearly establishes a conscious, deliberate and continuing purpose and intent to obstruct, hinder and embarrass the government of the United States and the prosecution of the war, and thus to give aid and comfort to the enemies of our country * * *."

The United States Constitution, in describing the crime of treason provides that "the Congress shall have Power to declare the Punishment of Treason," Article III, Section 3, Clause 3(2). Congress has determined that one of the punishments for treason is that "Every person so convicted of treason shall, moreover, be incapable of holding any office under the United States." This was the language of the statute that was in effect at the time of Berger's contest. The present counterpart is found in 18 U.S.C.A. § 2381, in which it says that a person so convicted "shall be incapable of holding any office under the United States."

Thus, although he had been convicted of sedition and not treason, Berger's rejection by the House of Representatives was on a determination by the House that he had committed treason, which, if found by a court would be a lack of qualifications prescribed by the United States Constitution. Although in the committee report, it was argued that the House was not limited to constitutionally defined "qualifications" in passing upon Berger's eligibility, nevertheless the action of the House in rejecting him falls within the pattern of what is permissible under the principles discussed in the Hughes Committee Report, supra. There was no court test of this exclusion.

William Blount, of Tennessee, was *expelled* from the Senate after having been seated. He was expelled "for conduct inconsistent with his public duty, rendering him unworthy of further continuance of his present public trust." This action was taken under the provision of the United States Constitution which authorizes "each House may determine the Rules of its Proceedings, punish its Members for disorderly Behavior, and, with the Concurrence of two-thirds, expel a Member." Article I, Sec. 5, Clause 2. It has nothing to do with Article I, Section 5, Clause 1, which provides that "each House shall be the Judge of the Elections, Returns and Qualifications of its own Members * * *." This is an important distinction because the authority to expel, unlike the provision relating to qualifications, is not limited by any language in the Constitution prescribing the grounds for expulsion.

John Smith, of Ohio, was cited for *treason and misdemeanor* as an accomplice of Aaron Burr. The Senate voted 19 for expulsion and 10 against. On the resolution failing to secure the necessary two-thirds, Smith retained his seat. Here, again, it was an action of expulsion. It is no precedent for giving "plenary" power to judge qualification.

John M. Niles, of Connecticut, was examined before taking the oath of office as to his mental capacities. The Committee found that he suffered under a mental physical debility, but that he was able to perform his duties, and he was seated. Of course, as noted above, *sanity is a qualification by the Georgia Constitution for members of the House and Senate of this State.*

John D. Bright, of Indiana, was expelled because it was found that he had written a certain letter to assist a member of the Confederate states to buy firearms. Note again that this was a matter of expulsion for an act of misconduct while a member and not a matter of determining qualification to be seated.

Joshua Hill and H. V. M. Miller, of Georgia, were refused seats in the United States Senate because of the manner in which the Georgia General Assembly, which had elected Hill and Miller, was conducting its elections. (Of course, this was at a time prior to the adoption of the 17th Amendment, and senators were elected by the State Legislatures.) This, of course, went directly to the question of judging "the election," which is expressly authorized by the United States and Georgia Constitutions. The Reed Smoot case has been discussed previously. It was again, a question of expelling a senator and not one of passing on his qualifications at the time he presented himself.

The most recent case involved Senator Theodore G. Bilbo, who was not administered the oath pending an investigation of charges that his actions dealing with racial policies were said to be "contrary to the public policy, harmful to the dignity and honor of the Senate, dangerous to the perpetuity of free government, and taint [sic] with fraud and corruption of the credentials."

If a substantial part of the charge was the question of fraud and corruption of the credentials, this, of course, would be a matter of judging "the election," which is specifically authorized. In any event, Senator Bilbo was forced to step aside for an operation and he died before action was taken on his seating.

In 1926, William S. Vare, of Pennsylvania, and Frank L. Smith, of Illinois, were refused seats for excessive expenditures during their respective election campaigns. Once again this was a question of judging "the election," authority for which is expressly given to the Senate.

If there are other cases involving action by the United States Congress in which it is expressly shown that it has assumed the right to expand the list of qualifications beyond those stated in the United States Constitution, they have not been brought to our attention.

It is quite difficult to ascertain from available materials, which, if any, state cases cited in the briefs of the parties were decided on a basis that explicitly shows that a state House or a state Senate has considered that it can determine a prospective member to be not qualified for grounds other than those stated in the respective constitutions as the qualifications or basis of eligibility for the office.

Representative-Elect Bond was not challenged on the ground that he was not 21 years of age; that he had not been a citizen of the State for the requisite two years and a resident of the county from which he was elected. Nor was he challenged on the ground that he had been convicted of treason against the state, embezzlement of public funds, misfeasance in office, bribery or larceny or any crime punishable by the laws of the state, punishable with imprisonment in the penitentiary. He was not charged with having received any interest, profit or perquisite arising from the use or loan of public funds. He offered to take the prescribed oath of office.

Since it cannot be claimed that he was found disqualified on some ground other than those of which he was charged, as this would be the clearest sort of deprivation of due process guaranteed not only by the United States Constitution, but also by the Georgia Constitution as well, Article I, Section I, Paragraph III, Constitution of the State of Georgia, Section

2–103, Ga.Code Ann., it is clear that Bond was found disqualified on account of conduct not enumerated in the Georgia Constitution as a basis of disqualification. This was beyond the power of the House of Representatives. It runs counter to the express provisions of the Georgia Constitution giving to the people the right to elect their representatives, and limiting the Legislature in its right to reject such elected members to those grounds which are expressly stated in Georgia's basic document.

As pointed out above, no Georgia decision has held that the courts of this state are helpless to intervene where a House of the Legislature undertakes to disqualify a person on a ground not specified. The decisions thus far reach only the proposition that where the Georgia Constitution authorizes the House to pass upon the qualifications of its members, all of the provisions in the Constitution touching on qualifications may be considered by the House in determining whether a member-elect meets the specified standards. In view of my conclusion that the action of the lower house of the General Assembly was in violation of the State Constitution, it would seem that Article I, Section IV, Paragraph II, would come into play. This section provides: "Legislative Acts in violation of this Constitution, or the Constitution of the United States, are void, and the Judiciary shall so declare them." Section 2–402, Ga.Code Ann. Since, therefore, a Georgia court is given the authority to declare such an act void, as in violation of the Georgia Constitution, pendent jurisdiction places this obligation upon this Court.

While it might be argued that, under normal circumstances, if there were nothing before this Court other than the charge that the State Legislature violated the Georgia Constitution, rules of comity might require that this Court refrain from assuming jurisdiction over such a controversy, this is not such a case. If we were to refrain from acting on the State constitutional question, we would then be faced squarely with the necessity of deciding the grave Federal constitutional question. That question is, whether the plaintiff has been deprived of his First Amendment rights by the action of the Georgia House. The gravity of that question cannot be doubted, since it is clear that it was for expression of his views that Bond was denied his seat. In view of the fact that all of plaintiff's rights can be fully adjudicated by our construction of the Georgia Constitution itself, we need not, and, indeed, we should not, proceed to a consideration of the Federal constitutional issue.

I would find that the act of the Georgia House of Representatives was void as being in violation of the Georgia Constitution and would require that he be seated to the place to which he was elected.

